**Patrick F. ROGERS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69598.**

Court of Criminal Appeals of Texas, En Banc.

May 3, 1989.

Rehearing Denied June 7, 1989.

248

David W. Holmes, Paris, for appellant.

Tom D. Wells, Dist. Atty., Paris, Robert Huttash, State's Atty., Austin, for the State.

**251**

## OPINION

TEAGUE, Judge.

On September 21, 1985, Patrick F. Rogers (henceforth "appellant") and Willis Cooper, a companion, left Oklahoma, drove across the border to Paris, Texas, and robbed two women at gunpoint in Braum's store. A short time later, while still driving around town, they were pulled over by Officer David Roberts, a Paris patrolman. Immediately after bringing his car to a complete stop, appellant exited the vehicle, approached the patrol car on foot, and shot Officer Roberts six times, causing his death. Appellant then returned to his own vehicle and drove away at high speed. After an intense search of the area in and around Paris, appellant was apprehended by the authorities and later indicted for the capital murder of Officer Roberts. V.T. C.A., Penal Code § 19.03(a)(1). After a jury found him guilty of capital murder and returned affirmative answers to the special issues submitted pursuant to Art. 37.071(b), V.A.C.C.P., appellant was sentenced to death. See Art. 37.071(e), V.A.C.C.P. His appeal to this Court is automatic. See Art. 37.071(h), V.A.C.C.P.; Tex.R.App.Proc., rule 40(b)(1). Appellant neither challenges the sufficiency of the evidence on guilt nor the jury's affirmative answers to the special issues.

### I.

The indictment in this cause charged appellant with "intentionally *and* knowingly" causing the death of a police officer. The trial court's charge to the jury authorized conviction upon a finding that he "intentionally *or* knowingly" caused such result. In his first point of error, appellant complains that the trial judge improperly permitted conviction on a theory other than that alleged in the indictment.

This Court has long approved the practice of prosecuting authorities to plead culpable mental states conjunctively and submit them for jury consideration disjunctively whenever the statutory language is disjunctive. *Ely v. State*, 582 S.W.2d 416, 421 (Tex.Cr.App.1979) (on original submission); *Cowan v. State*, 562 S.W.2d 236, 240 (Tex.

Cr.App.1978) (rehearing denied en banc). *But cf. Hunter v. State*, 576 S.W.2d 395 (Tex.Cr.App.1979) (holding that disjunctive pleading of culpable mental states is permissible); *Montgomery v. State*, 639 S.W.2d 949 (Tex.Cr.App.1982) (holding that conjunction of culpable mental states in jury charge requires jury to find both).

Indeed, as a general rule it is not objectionable for the State to plead alternative theories of culpability conjunctively, while authorizing conviction if any one or more of such theories is sufficiently proven at trial. *E.g., Garrett v. State*, 682 S.W.2d 301, 309 (Tex.Cr.App.1984), cert. denied 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (allegation of "choking *and* strangling" in capital murder indictment will support conviction when either "choking *or* strangling" is proven; *Vaughn v. State*, 634 S.W.2d 310, 312 (Tex.Cr.App.1982) (allegation "threaten *and* place in fear" in robbery indictment will support conviction when proof shows that accused did either "threaten *or* place in fear"); *Garcia v. State*, 537 S.W.2d 930 (Tex.Cr.App.1976) (allegation that accused was "arrested for, charged with, *and* convicted of" an offense in an escape indictment will support conviction when either "arrested for, charged with, *or* convicted of" is proven).

We decline to reconsider this body of well-settled authority in the instant context. Accordingly, appellant's first point of error is overruled.

### II.

In his second, third and fourth points of error, appellant contends that three veniremen were erroneously excluded for cause on account of their opposition to the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), prohibits exclusion of a prospective juror merely because he expresses conscientious scruples regarding the penalty of death. However, such veniremen may be excluded when their views concerning capital punishment are such that they would be prevented or substantially impaired in the performance of their duties as jurors. *Wainwright v. Witt*, 469

U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Sharp v. State,* 707 S.W.2d 611, 620 (Tex.Cr.App.1986). The question is one of fact for the trial judge, and his conclusions concerning the qualifications of a prospective juror will not be disturbed on appeal so long as the record discloses sufficient evidence to support a rational finding that the venireman in question was, indeed, impaired in his ability to discharge the legal responsibilities of a juror. *Hernandez v. State,* 757 S.W.2d 744 (Tex.Cr.App.1988). *Cf. e.g., Vanderbilt v. State,* 629 S.W.2d 709, 729 (Tex.Cr.App.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (when prospective juror is equivocal in his answers, trial judge usually does not err in finding him substantially impaired); *Briddle v. State,* 742 S.W.2d 379, 384–385 (Tex. Cr.App.1987) (when prospective juror vacillates between inconsistent answers, trial judge usually does not err in finding him substantially impaired). In a capital case, the responsibilities of a juror include a willingness to resolve certain factual issues honestly even though an honest resolution of the issues might result in the imposition of a death sentence. *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Johnson v. State,* 698 S.W.2d 154, 165 (Tex.Cr.App.1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164. By these standards, it is reasonably clear that the trial judge did not err in sustaining the State's challenges for cause to the three veniremen here in question.

Sarah Jane Casey averred from the outset, in response to questions of the trial judge, that "under no circumstances could [she] ever return a verdict that had the affect [sic] of assessing the death penalty." It soon became apparent that she had been opposed to capital punishment on religious grounds for many years. The prosecuting attorney then explained the procedure prescribed by Texas law at the penalty phase of a capital murder trial, including the legal effect of affirmative answers to the special jury issues. Casey continued to insist that her beliefs would make it impossible to serve on a capital jury, responding affirmatively to a wide variety of leading questions from the prosecutor, such as "And so I assume that your belief would have a profound and disabling affect [sic] on your deliberations." When reminded by defense counsel that she would only be called upon to answer questions of fact, she nevertheless responded, "I would like to think that I could tell the truth about it but I'm not sure that the death penalty wouldn't influence my decision." The trial judge intervened at this point to suggest that, rather than lie, she might simply refuse to answer one or more of the special issues. In the end, and without ever indicating otherwise, Casey affirmed that she was "absolutely sure" that she "couldn't overcome [her] belief against the death penalty to answer these questions yes, even if [she] were supposedly convinced beyond a reasonable doubt[.]"

Things proceeded in much the same way with prospective juror Jean A. Griffin, except that the trial judge initially explained to her the procedure in a capital case wherein the jury must answer special issues at the punishment phase of trial. Griffin's opposition to capital punishment appears to have been based upon a moral conviction of recent vintage. Even so, after first expressing some uncertainty about the probable effect of her new beliefs on her performance as a juror, she affirmed "that regardless of the state of the evidence, [she] could never answer [a] question yes, knowing that the death penalty would be inflicted as a result of [her] answer[.]" The prosecutor's questions essentially provided an opportunity for her to reaffirm this position, although she did indicate at one point, "I really don't think I could lie." Griffin ultimately responded to questions from defense counsel by insisting that she would refuse to answer the special issues at all rather than give an answer that might result in imposition of the death penalty.

Finally, venireperson Gella Ross stated from the beginning that she could not vote to impose capital punishment even for the most heinous of crimes. Indeed, she felt that the possibility of a death sentence might affect her determination of a defendant's guilt or innocence. Yet, when the

trial judge explained that a capital jury is only called upon to answer certain questions of fact, Ross unequivocally stated, "I think I could vote honestly" even though she admitted that the possibility of an impending death sentence "would greatly influence me." Under questioning by defense counsel, she gave assurance that she would never be influenced to the point of lying in her answers. But, upon further interrogation by the trial judge and prosecuting attorney, she opined that her judgment might be impaired by her opposition to capital punishment such that "I don't think I would be fair ... I don't think I would even be able to answer that correctly."

Clearly, a venireman is not disqualified from service on a capital jury merely because his views regarding the death penalty might influence his decision-making process. *See Adams v. Texas, supra; Durrough v. State,* 620 S.W.2d 134, 142 (Tex. Cr.App.1981). And it is possible that each prospective juror here in question might merely have been more critical in her evaluation of the evidence, more exacting in her understanding of reasonable doubt, or more circumspect in her interpretation of the special issues on account of opposition to capital punishment than would otherwise have been the case. If so, she would not have been challengeable for cause. But the evidence does not admit only this conclusion. Especially in the cases of venirepersons Casey and Griffin the evidence discloses a substantial probability that each would rather refuse to reach a verdict than risk the possibility that an honest verdict might lead to a sentence of death. Venireperson Ross's response that she would not be able to answer "correctly" and might be unfair intimates a like possibility. *Cf. Cordova v. State,* 733 S.W.2d 175, 186 (Tex.Cr. App.1987) (prospective juror who indicates an inability to decide issues fairly is challengeable for cause). Deliberate failure to report a true verdict is a substantial impairment in any juror, and when supported by the record will authorize sustaining a challenge for cause. *See East v. State,* 702 S.W.2d 606, 610 (Tex.Cr.App.1985), *cert. denied,* 474 U.S. 1000, 106 S.Ct. 418, 88

L.Ed.2d 368. *Cf. Castillo v. State,* 739 S.W.2d 280, 296 (Tex.Cr.App.1987), *appeal dismissed, cert. denied,* — U.S. —, 108 S.Ct. 2889, 101 L.Ed.2d 924 (deliberately answering a special issue falsely also indicates substantial impairment).

Accordingly, the trial judge did not err in excusing venireperson Casey, Griffin, and Ross pursuant to the State's challenges for cause in the instant case. Appellant's points of error two, three, and four are, therefore, overruled.

### III.

In his fifth point of error appellant complains that prospective juror Sherry Haskin was improperly excused on a state's challenge for cause without statutory basis. During *voir dire,* when asked by the trial judge whether jury service might be "an insurmountable hardship" for her, Haskin replied that "[i]t would be very difficult due to committments both of my children have." It seems that her daughter, a competitive gymnast, needed to be driven some distance to practice after school, while her son couldn't "be left alone too much of the time right now" for reasons which Haskin was reluctant to disclose. Since her husband was expected to be out of town on business during much of the following few months, and because no friends or relatives were available to supervise her children during this time, Haskin was not eager to serve as a juror in this cause. Nevertheless, she averred that she could "listen attentively" to the evidence and would not "rush into a decision one way or the other", although she admitted that her attention might wander somewhat late in the afternoon out of concern for her children. The State challenged her for cause "based on the hardship that she has explained to the court", which the trial judge sustained over appellant's objection because she "could not give this cause [her] full attention."

Appellant maintains that Art. 35.16, V.A. C.C.P. does not specifically authorize a challenge for cause to be made upon this basis. Although he is quite right, this

Court recently held in *Nichols v. State,* 754 S.W.2d 185, 193 (Tex.Cr.App.1988) that:

> ... a challenge for cause can properly be asserted on grounds which are not specifically enumerated in Article 35.16, V.A.C.C.P., where such a challenge is based on facts that show that the prospective juror would be "incapable or unfit to serve on the jury."

Also see *Sosa v. State,* 769 S.W.2d 909 (Tex.Cr.App.1989).

In *Nichols,* we upheld the trial judge's finding that a prospective juror was unfit for jury service because such service would have conflicted with his plans to get married and because he would, therefore, be "preoccupied with personal problems". 754 S.W.2d at 193–194. *See also Moore v. State,* 542 S.W.2d 664, 669 (Tex.Cr.App. 1976) (prospective juror challengeable for cause when "all she could think about was how she was going to pay her bills, etc.") A like rationale applies with equal force to the instant cause. *Compare* Art. 35.03, § 1, V.A.C.C.P. (trial judge may discharge a juror or postpone his service if he deems the juror's "excuse sufficient") Therefore, the testimony of Haskin was sufficient to support a finding by the trial judge that she was "unfit" for jury service. Appellant's point of error number five is overruled.

### IV.

■ In his sixth point of error appellant argues that the trial judge should not have sustained the State's challenge for cause to venireperson Jacquelyn Joy Scott, because "an improper element of murder has been posed to obtain witness' responses[.]" Almost from the beginning of her *voir dire* examination, Scott evinced an unwillingness to consider the minimum punishment of five years incarceration should appellant ultimately be convicted of the lesser included offense of murder. Fully two-thirds of the examination of this prospective juror by trial judge, prosecutor, and defense attorney was devoted exclusively to this issue. After repeatedly insisting for half this time that she could never vote to assess as little as five years for the offense of murder, her answers appeared to soften somewhat, and the following colloquy between her and the trial judge occurred:

> Q. There could be a situation where a person was guilty of murder in which you could give as little as five years; is that right?
>
> A. Depending on the circumstances, yes. It depends. But I don't think that if somebody has deliberately murdered somebody—
>
> Q. They are not going to be guilty of murder unless it was deliberate.

Appellant maintains that this statement by the trial judge was tantamount to an erroneous instruction that "deliberate" is an element of murder and that, but for such instruction, Scott would not have been subject to challenge for cause.

While it is certainly true that "deliberate," at least insofar as it is distinguishable from "intentional," *see Marquez v. State,* 725 S.W.2d 217, 244 (Tex.Cr.App.1987), *cert. denied* 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152, is not a statutory element of murder, it is doubtful on the record before us that the venireperson was affected by the trial judge's comment in the way suggested by appellant. As previously noted, Scott consistently stated, even prior to the trial judge's remark, that she could not vote to assess a penalty of five years for murder. Clearly, she was not initially moved by anything the judge said to take this position. Moreover, it seems likely from context the judge meant to emphasize that accidental or justified killings do not constitute murder, rather than to misrepresent the level of culpability attached to the offense. In any event, the confusion was shortly cleared up by defense counsel himself in the following exchange:

> A. [Venireperson Scott] I would have to weigh the evidence, yes, I would have to give it consideration in weighing the evidence, yes, I would have to consider it. But my beliefs would be that if found guilty and it was deliberate or whatever I would have to forgo the five years, or the minimum.

Q. [Defense counsel] Well, of course, now, you are saying deliberate but really the word is intentional.

A. Intentional, okay.

Q. If it wasn't intentional, it wouldn't be murder, like the judge said.

Thereafter, Scott persisted in the view that she could not assess a punishment as lenient as five years for a case of murder. From this circumstance, one might reasonably infer that her position on the issue was not affected by technical differences between the terms "deliberate" and "intentional." Accordingly, the trial judge did not err in excusing her based upon the State's challenge for cause. Appellant's sixth point of error is, therefore, overruled.

### V.

█ In point of error number seven, appellant asserts that his challenge for cause to venireman Richard Alston was denied erroneously by the trial judge, inasmuch as this prospective juror expressed an inability to hold the State to its burden of proof at trial. Omitting only interjections by the trial judge and comments by counsel and the venireman not in response to questioning, the following is the entire segment of Alston's *voir dire* pertinent to this point of error:

Q. [Defense counsel] All right. I want you to suppose with me that for some reason right now you had to get up and go to the jury room and vote, how would you vote?

A. [Venireman Alston] Well, I couldn't vote right now because I haven't heard anything.

Q. Well, of course, you have told us that you are presuming Mr. Rogers is innocent, that he is not guilty.

A. That's right.

Q. Are you really giving him the benefit of that presumption?

A. Well, the only—

. . . . .

Q. Are you assuming in any way that he may be guilty?

A. No, sir.

Q. Just because you are here?

A. No, absolutely not.

Q. Well, if you had to go vote, you couldn't vote, you couldn't vote him not guilty right now? Because you have not heard anything and you have got to give him the presumption of innocence. That's our law.

A. But the law also says that he has got to have a trial and I'm here for a trial.

. . . . .

Q. What is a presumption of innocence? What does it mean to you?

A. To me at this point until proven otherwise, the man is innocent.

. . . . .

Q. ... [A]re you going to insist that he tell his side of the story?

A. No. They have got to prove to me that the man committed the crime.

Q. But you are not going to require him to do anything? Does he have to call witnesses in the trial in which you would be a juror?

A. Only when—I don't know. The only thing I can think of is to defend against what they are telling me. If you want to—in other words, if their evidence is showing that he is guilty, then this person would want to have witnesses to show that it wasn't true or something.

. . . . .

Q. ... [Y]ou would expect us if they offered evidence, you would expect us to com [sic] forth and prove that he's not guilty?

A. Yes, I think so.

Q. And you would expect that as you sit there today and that's why you couldn't go vote today?

A. I would have to say yes.

Defense counsel then challenged Alston for cause. But the trial judge reserved ruling pending further *voir dire* by the State. Without setting forth these questions and answers verbatim, suffice it to say that Alston unequivocally affirmed that he would require the State to produce evidence convincing him beyond reasonable doubt of appellant's guilt, regardless of

whether appellant offered any evidence in defense. At this point, appellant's challenge for cause was overruled.

Several observations are pertinent here. First, reluctance to make important decisions does not necessarily indicate any prejudice against the burden of proof prescribed by law, since failing to cast a vote is not tantamount to a vote of guilty. Of course, it is not equivalent to an acquittal either, and under the hypothetical situation raised by defense counsel's question, appellant plainly would have been entitled to an acquittal. But a case in such posture, i.e. where the State offered no evidence at all, could not lawfully be submitted for full jury consideration anyway, certainly not in the face of a motion for instructed verdict.

Second, it does not appear that Alston expected to hear evidence from the defense except under circumstances where the State first offered evidence proving the appellant to be guilty. On the face of it there is nothing objectionable in this attitude. Indeed, once the State makes a *prima facie* case for guilt, legally sufficient to support conviction, any rational factfinder, if he thinks such evidence credible, is entitled to consider it dispositive when uncontroverted, so long as, standing alone, it convinces him beyond a reasonable doubt that the accused is guilty. What a juror may not do is consider evidence to be strong enough for conviction, when he would otherwise have been unconvinced of the accused's guilt, merely because the accused did not rebut it.

By these standards it seems likely that Alston was not biased or prejudiced against the burden of proof in criminal cases. Based upon the questions he was asked, it appears he was fully willing to insist the State prove its case against appellant beyond reasonable doubt and that the ultimate burden of persuasion remain upon the prosecution throughout trial. Certainly, the trial judge did not act contrary to the evidence in concluding that appellant had not proven Alston to be objectionable in this regard. *See Mays v. State*, 726 S.W.2d 937, 951 (Tex.Cr.App.1986), *cert. denied* — U.S. ——, 108 S.Ct. 1059, 98 L.Ed.2d 1020; *Bell v. State*, 724 S.W.2d 780, 797 (Tex.Cr.App.1986); *Barefoot v. State*, 596 S.W.2d 875, 881–883 (Tex.Cr.App.1980), *cert. denied* 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996; *Scott v. State*, 490 S.W.2d 578 (Tex.Cr.App.1973). Appellant's seventh point of error is overruled.

## VI.

In point of error number eight, appellant complains that he was not permitted to argue before the jury against the death penalty. Specifically, appellant's trial counsel attempted to argue that the death penalty is not a general deterrent to crime, but was prevented from doing so by the trial judge. He claims this ruling violated Art. 37.071(a), V.A.C.C.P., which provides in pertinent part that "[t]he state and the defendant or his counsel shall be permitted to present argument for or against the sentence of death."

One of the purposes of our criminal justice system, at least insofar as it is reflected by the Texas Penal Code, is "to insure the public safety through ... the deterrent influence of the penalties [t]herein provided[.]" Penal Code, § 1.02(1)(A). One such penalty is death by lethal injection. Whether this, or any other punishment prescribed by law, does in fact effectively deter the commission of crime is an empirical question and beyond the factfinding powers of this or any other Texas court. Equally, it is beyond the factfinding authority of a trial jury. The people of Texas evidently intend that the death penalty will deter crime. Arguments to the effect that it does not do so in fact have been rejected by the legislatures of most states, including Texas. The courts are not an appropriate forum in which to debate the issue anew.

An accused or his lawyer may, of course, argue that the death penalty is not indicated in a particular case. As the State argues in its brief (pp. 16–17) before this Court:

What the sentence in paragraph (a) of Article 37.071 means is that the State and the Defendant shall be permitted to argue for and against sentence of death

in the particular case on trial, under the particular facts as introduced into evidence or, in other words, over how the issues submitted to the jury under Article 37.071 should be answered under the facts before the jury.

It is immaterial, however, in any particular case whether the death penalty operates effectively as a general deterrent, that is whether execution of a particular individual will in fact discourage others from the commission of capital murder.

Particularly in this State, where an argument "against the sentence of death" necessarily means an argument against affirmative answers to the special jury issues, it is really quite meaningless to insist upon the right to criticize the death penalty in final argument. Surely, an accused is not entitled to urge that jurors do something which, if they had indicated a willingness to do during jury selection, would have made them challengeable for cause even under *Adams v. Texas, supra* and *Wainwright v. Witt, supra.* In short, a juror may not answer that the accused didn't act deliberately or that he won't be dangerous in the future just because capital punishment isn't a general deterrent to crime. A juror is not at liberty to answer any of the three special issues in the negative based in whole or part upon the argument appellant wanted to make in this case. Accordingly, there is no basis for concluding that he was entitled to make it. His point of error number eight is overruled.

### VII.

■ In his ninth, tenth, and eleventh points of error, appellant claims that the trial judge erroneously received evidence of four extraneous offenses during the guilt/innocence phase of trial. Immediately after the murder in this cause, appellant and his cohort fled at high speed in their automobile, followed in hot pursuit by a truckload of Paris teenagers who had witnessed the shooting. Although appellant and his companion were able to elude these pursuers, the area surrounding Paris was quickly cordoned with roadblocks and law enforcement officers on foot. The two fugitives, evidently aware of the intense search, attempted to escape by abandoning their automobile, stealing another, and driving through back roads. During the course of their unsuccessful escape attempt they entered the home of an invalid woman without permission, attempted to abduct her and other persons in the vicinity, and eventually forced an elderly man to accompany them after commandeering his truck. Appellant maintains that proof of these events shows the commission of one burglary, two attempted aggravated kidnappings, and one aggravated kidnapping completed. So long as the list is not meant to be exhaustive, we have no disagreement with appellant's characterization of his own conduct in this regard. However, we do not agree that the trial judge erred in refusing to exclude this evidence.

Although not expressly relevant to any material issue raised by the State's pleadings or by a defensive theory developed at trial, evidence of other offenses has been rather uniformly allowed by this court when it serves to place the alleged crime in its immediate context. *E.g., Wilkerson v. State,* 736 S.W.2d 656, 659–661 (Tex.Cr. App.1987), and cases cited therein. This context includes events leading to apprehension of the accused when such events are not clearly distinguishable from a continuing transaction of which the charged offense is a part. *Maddox v. State,* 682 S.W.2d 563 (Tex.Cr.App.1985). In other words, extraneous offenses may be proven when they are *res gestae* of the alleged crime.

Here, although the hot pursuit and eventual capture of appellant and his companion did not contribute at all to the proof that appellant committed capital murder, it did serve to enlighten the jurors regarding events immediately following the murder, and was therefore within the traditionally permissible scope of *res gestae* proof. Appellant's ninth, tenth, and eleventh points of error are overruled.

### VIII.

■ In his twelfth point of error appellant essentially alleges that the wife of the

deceased police officer should not have been permitted to testify at trial in this cause because she was pregnant at the time. He asserts that her testimony was either irrelevant or duplicative and that it added nothing to the State's case except "the visual aid that she was pregnant," a circumstance which he claims operated to prejudice him unfairly.

The testimony of the witness included identification of the deceased in a photograph taken at their wedding, subsequently offered as State's Exhibit 1 without objection. The witness also testified that her husband had been employed at the time of his death as a patrol officer with the Paris Police Department and that he had no "physical impairments."

Appellant correctly asserts that this testimony could have been supplied, and was indeed supplied, by other witnesses later in trial. However, Roberts was the State's first witness, and her testimony was not, therefore, duplicative at the time given. Moreover, although of minimal probative value to the State, it cannot be said that her testimony was irrelevant. Clearly, in a capital murder prosecution under the theory alleged in this case, the deceased must be identified as a peace officer. Apparently, what appellant finds objectionable is simply the circumstance of Mrs. Roberts's pregnancy.

In point of fact, the record does not reflect, nor did appellant ever request that it be made to reflect, that the witness was indeed pregnant at the time of her testimony. However, as the State does not dispute appellant's allegation, we are willing to assume for purposes of argument that the witness was actually pregnant at the times in question. Nevertheless, we are unwilling to establish a rule of law to the effect that sympathy engendered by the pregnant wives of deceased persons is automatically so great as to produce unfair prejudice against a criminal defendant. It is still possible, we think, for ordinary people to feel sympathy for the victims of crime and for their relatives without inferring that the presumably innocent person

on trial is therefore guilty as charged. Appellant's twelfth point of error is overruled.

## IX.

In his thirteenth point of error appellant complains of the receipt into evidence over his objection of autopsy photographs depicting the body of the deceased police officer. Such evidence has often been regarded as presenting a potential for unfair prejudice against a criminal defendant when it is, or might appear to an ordinary person, especially gruesome. Generally, this Court has taken the approach that photographs are admissible if the matters they depict are an appropriate subject for oral testimony. *E.g., Jackson v. State,* 745 S.W.2d 4, 18 (Tex.Cr.App. 1988), *cert. denied* — U.S. —, 108 S.Ct. 2916, 101 L.Ed.2d 947; *Martin v. State,* 475 S.W.2d 265, 267 (Tex.Cr.App.1972), *appeal dismissed* 409 U.S. 1021, 93 S.Ct. 469, 34 L.Ed.2d 312. However, to be admissible over objection, the potential for unfair prejudice must not substantially outweigh the probative value of the evidence. Tex.R. Crim.Ev., rule 403.

Plainly, in the instant case, the State had to prove, among other things, the cause of death. To this end, the pathologist who performed an autopsy on the deceased testified at trial and, without objection, described in some detail the injuries suffered by Officer Roberts when appellant fired six .38 caliber bullets into his body at fairly close range. During a part of this testimony, he referred to the photographs in question for illustrative purposes. From this Court's perspective, the testimony sounds a lot worse than the pictures look. In any case, we are not able to say that the trial judge's own opinion in this regard was erroneous as a matter of law. Therefore, appellant's thirteenth point of error is overruled.

## X.

In points of error fourteen and fifteen, appellant maintains that the State was erroneously permitted to offer proof of two prior offenses at the punishment phase of trial without establishing that appellant

committed those offenses. *See Turner v. State,* 754 S.W.2d 668, 673 (Tex.Cr.App. 1988); *Landers v. State,* 519 S.W.2d 115, 120 (Tex.Cr.App.1975) (on State's motion for rehearing). Although he admits to previous convictions in Oklahoma for robbery and unauthorized use of a motor vehicle, and concedes that proof of these crimes was permissible at the "punishment" phase of his trial, he seems to argue that certain details surrounding the offenses should have been excluded.

 Specifically, in the case of his robbery conviction, he contends that the prosecutor should not have been permitted over objection to ask him whether he caused bodily injury to the victim, thereby suggesting to the jury that he was guilty of a more serious offense than the one for which he was convicted. We find little merit in this contention. As appellant himself acknowledges, the "punishment" phase of a capital case is unlike that of other cases inasmuch as the specific details of a defendant's prior criminal activity, even if unadjudicated, may be put in evidence to inform the jury's decision-making task with regard to the probability of his future dangerousness. *See Gentry v. State,* 770 S.W.2d 780, 792–793 (Tex.Cr.App.1988). Moreover, if it is appellant's contention that the prosecutor asked questions in bad faith, having no objective basis for the belief that appellant caused bodily injury, it was appellant's duty to make an objection upon such ground, and force the prosecutor to divulge, outside the jury's presence if necessary, the source of his information. *See Hernandez v. State,* 532 S.W.2d 612, 614 (Tex.Cr.App.1976); *Keel v. State,* 434 S.W.2d 687, 690 (Tex.Cr.App.1968). In any case, appellant's categorical denial that he physically assaulted his robbery victim in Oklahoma is the only evidence upon the subject. Accordingly, there is no basis to think that any rational juror would have concluded he did commit a separate assault. Absent a showing of bad faith, the trial judge did not err in permitting the prosecutor to ask appellant a leading question to such effect on cross-examination. Point of error fourteen is overruled.

 With respect to his Oklahoma conviction for unauthorized use of a motor vehicle, appellant insists that the complaining witness in that case should not have been permitted to testify in the instant cause that his car was taken in a robbery. Because the complaining witness was not able to identify appellant as one of the assailants in the robbery, it is urged that evidence of the robbery should have been excluded. However, because appellant did not interpose an objection to this testimony at trial, no error attended its receipt into evidence. *E.g., Rico v. State,* 707 S.W.2d 549, 554 (Tex.Cr.App.1983) (on State's motion for rehearing). Therefore, his fifteenth point of error is also overruled.

### XI.

In points of error sixteen through twenty-one, inclusive, appellant asserts that the trial judge should have suppressed in-court identification of him by six witnesses because their ability to make an accurate identification had been tainted by a suggestive out-of-court photograph and corporeal lineup. The photograph appeared in a local newspaper and depicted the arrest of appellant. The lineup occurred one day later. All eye witnesses appearing at the lineup had seen the newspaper photograph and apparently viewed the appellant at the lineup in an array with other persons of similar appearance. Evidently, the witnesses were not prevented from conferring among themselves before being called upon, one by one, to make an identification. All six in question were able at that time to identify appellant. Each also identified the appellant at trial.

The greatest danger under circumstances of this kind is that witnesses, not otherwise able to recognize the accused, will nevertheless positively identify him at a police lineup and subsequently at trial because they recognize him as the suspect pictured in a newspaper article. Consequently, in the instant case each witness was questioned in detail upon this very issue prior to trial by counsel for the defense, the prosecutor, and the trial judge. All six of the witnesses here complained of

reported that the newspaper photograph did not influence their identification of appellant at the lineup. A seventh witness admitted that the newspaper photograph did assist her in identifying appellant at the lineup, and the trial judge accordingly sustained appellant's objection to her as an identification witness before the jury at trial.

Appellant acknowledges the long-standing rule that suggestive pretrial identification procedures used by law enforcement officials should result in the exclusion of identification testimony at trial only when such procedures give rise to a substantial probability of irreparable misidentification. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Ordinarily, such probability does not arise when, as here, witnesses confidently affirm that their identifications are based exclusively upon a recollection of the events witnessed by them and not upon the pretrial identification procedures in question. *E.g., Jackson v. State*, 657 S.W.2d 123, 130 (Tex.Cr. App.1983).

We note that the instant case involves no alleged suggestiveness in the pretrial identification procedure itself. Appellant does not complain of the lineup so much as he does of the newspaper photograph, the latter being, so far as we can tell, no part of a greater scheme by law enforcement officers to suggest to an otherwise unsuspecting audience that the appellant in fact murdered a Paris policeman. Given the absence of any official action contributing to the liklehood of misidentification in this case, the constitutional sanction of inadmissibility should not be applied, regardless of the extent to which any witness's in-court identification might have been rendered less reliable by prior exposure to the newspaper photograph. *Webb v. State*, 760 S.W.2d 263, 269 (Tex.Cr.App. 1988); *Williams v. State*, 675 S.W.2d 754, 757 (Tex.Cr.App.1984). *See Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977) (questions of reliability are ordinarily for the factfinder when identification procedures are not corrupted by suggestiveness producing "a

very substantial likelihood of irreparable misidentification").

Of course, witnesses who viewed it might have been inclined to identify appellant from the photo and not from a clear recollection of the live events seen by them several days earlier, as was indeed the case with one witness. But the six other witnesses here in question were, so far as the record reflects, not affected in their ability to make an accurate identification of appellant by the challenged newspaper photograph. Since the police procedure was not itself suggestive, the fact that several eyewitnesses were exposed to a media photo of appellant one day before attending a police lineup might, at most, be taken to affect the weight, although not the admissibility, of their trial testimony. Appellant's points of error sixteen through twenty-one are, therefore, overruled.

## XII.

In points of error twenty-two through twenty-five, inclusive, appellant asserts that the trial judge erred in denying his request for written pretrial statements of four identification witnesses so that he could effectively cross-examine them at the hearing on his motion to suppress their in-court identification of him. He argues that such statements are as essential for the effective cross-examination of witnesses before the trial judge on preliminary questions of fact as they are before the jury on ultimate questions of fact. *See Cullen v. State*, 719 S.W.2d 195 (Tex.Cr.App.1986) (contemporary explanation of judicially-created rule for the disclosure of testifying witness's prior statements); *Gaskin v. State*, 172 Tex.Crim. 7, 353 S.W.2d 467 (1961).

We do not reach this question, however, because appellant has failed properly to perfect it for our review. Refusal to order the disclosure of a witness's prior statement does not present reversible error when such statement is wholly consistent with his testimony at trial. *Hoffman v. State*, 514 S.W.2d 248 (Tex.Cr.App.1974). Since *Gaskin* itself, *supra* at 470 (on State's motion for rehearing), we have held

that an accused desiring to complain of the trial judge's failure to order disclosure must request that a copy of the statement be included in the appellate record, so that the reviewing court can determine whether the accused's right to effectively cross-examine the witness was adversely affected in fact. *Mendoza v. State,* 552 S.W.2d 444, 448 (Tex.Cr.App.1977). In the instant cause, appellant failed to do this. Hence, we are not able to adjudge the merits of his contention in points of error twenty-two through twenty-five, and they are for this reason overruled.

### XIII.

Prior to trial appellant filed a written motion to quash the indictment, alleging irregularities in selection of the grand jury. *See* Art. 19.27, V.A.C.C.P. (objection to the legality of a grand jury may be made only by challenge to the array before the grand jury is empaneled); *Muniz v. State,* 672 S.W.2d 804, 807–808 (Tex.Cr.App.1984) (defendant may challenge the legality of a grand jury by motion to quash its indictment if he had no opportunity to challenge the array of grand jurors before empaneled). After a full evidentiary hearing, the trial judge overruled this motion, giving rise to appellant's twenty-sixth point of error.

Specifically, appellant claims he was denied due process of law in that the grand jury which indicted him was "unlawfully impanelled." He does not allege that the grand jury as a whole was challengeable for reasons set out in Art. 19.30, V.A.C.C.P., nor that any individual grand juror failed to meet the qualifications prescribed by Arts. 19.01 and 19.08, V.A.C.C.P. Moreover, he does not contend that the grand jury was formed in a racially discriminatory manner or in such other way as to deny him equal protection of the laws. Rather, appellant suggests that some of the commissioners appointed to select the grand jury here in question acted improperly by choosing persons to whom they were related by marriage or with whom they had been associated in business. In point of fact, it does appear that one of the grand jurors in question was married to a com-

missioner at the time of her service and that another was employed by the same company as was a second commissioner. Appellant maintains that these circumstances enabled the commissioners in question to extend their influence over grand jury deliberations to a greater degree than is legally permissible.

■ One of the methods for selecting a grand jury in Texas, wherein commissioners appointed by a district judge in turn choose persons to serve as grand jurors, has been rightly criticized as having a high potential for abuse. *See* Art. 19.01(a), 19.02 *et seq.,* V.A.C.C.P.; *Partida v. Castaneda,* 524 F.2d 481, 484–485 (5th Cir.1975). Clearly, when commissioners select grand jurors who have prejudged matters which will come before them for consideration or who are willing to be controlled by outsiders, including the commissioners themselves, the impartiality and independence of the grand jury is undermined and its indictments subject to question. *Cf. Long v. State,* 170 Tex.Crim. 262, 340 S.W.2d 58 (1960) (selection of grand jurors for purpose of securing the indictment of a particular person violated former Art. 358, Vernon's Ann.C.C.P.). But this does not mean that commissioners must necessarily avoid the selection of persons with whom they are acquainted, to whom they are related, or with whom they work. *See Carrillo v. State,* 566 S.W.2d 902, 918–919 (Tex.Cr.App.1978) (panel opinion, rehearing en banc denied). Unless it can be demonstrated that selection of the grand jurors was in fact made with a view to securing the indictment of particular persons, or in such other manner as effectively to defeat the grand jury's impartiality or independence, due process of law is not offended merely because a personal or professional relationship exists between certain grand jurors and the commissioners who appointed them.

■ In the instant cause, the grand jurors of whom appellant complains denied under oath that they in any way prejudged the case against appellant or that they were influenced to return an indictment

against him by any person not on the grand jury or appearing before it. Likewise, the commissioners of whom appellant complains testified that they did not prejudge the case against appellant, that their selection of persons to serve on the grand jury was not motivated by a desire that appellant be indicted, and that they did not attempt to influence in any way the grand jury's deliberations after it was formed. Indeed, the offense for which appellant was later charged by indictment had not yet been committed when the grand jurors here in question were selected. The record contains no evidence of any kind to the contrary. Accordingly, the trial judge's conclusion that appellant was not denied due process of law and, therefore, not entitled to have the indictment against him quashed was justified by the evidence. Appellant's point of error number twenty-six is overruled.

### XIV.

■■■ In point of error twenty-seven, appellant alleges that he was erroneously denied legal counsel "prior to convening of the Lamar County grand jury to consider the allegations made against him." However, appellant admits in his brief that legal counsel was, indeed, appointed to represent him at a pretrial line-up well before the grand jury returned an indictment against him. Evidently, his real complaint is that an attorney was not appointed for the purpose of representing him before the grand jury itself. So considered, his point is without merit, as the law does not entitle the subject of a criminal investigation to appear personally or by legal counsel before the grand jury conducting such investigation. *Morin v. State*, 682 S.W.2d 265, 267 (Tex.Cr.App.1983); *Moczygemba v. State*, 532 S.W.2d 636 (Tex.Cr.App.1976). Although an accused person does have the right to an attorney's assistance at all critical stages of criminal proceedings against him, appellant suggests no specific circumstance or manner in which his substantial rights were adversely affected prior to indictment in this cause by failure of the State to provide him the assistance of an attorney. Consequently, his twenty-seventh point of error is overruled.

### XV.

■■■ In point of error number twenty-eight, appellant complains that the State was erroneously permitted to reopen so that it could elicit further testimony from an important prosecution witness at the punishment phase of trial. Dr. James Grigson, a forensic psychiatrist well-known to this Court, was called by the prosecution at the guilt/innocence phase of trial to rebut appellant's defensive theory of insanity. On cross-examination, appellant elicited further testimony from the doctor to the effect that a sociopath, such as appellant, could reliably be expected to persist in criminally violent behavior throughout his lifetime. Following this testimony, Dr. Grigson was excused without expressly being made subject to recall as a witness in the case.

In due course appellant was convicted of capital murder and, after both sides closed at the "punishment phase" of trial, he requested that the jury be instructed in the court's charge not to consider the testimony of Dr. Grigson elicited at the guilt/innocence phase of trial for the purpose of determining "whether there is a probability that ... [appellant] would commit criminal acts of violence that would constitute a continuing threat to society[.]" *See* Art. 37.071(b)(2), V.A.C.C.P. He claimed to be entitled to such instruction under this Court's holding in *Garcia v. State*, 626 S.W.2d 46 (Tex.Cr.App.1982), wherein we judged the opinion of a psychologist to be valueless in assessing the sufficiency of evidence to show future dangerousness when the basis for that opinion was not apparent from the record of trial. We of course express no view on the correctness of appellant's contention in this regard, since his point of error implicates a different issue.

Apparently based upon appellant's requested jury instruction, however, the State moved to reopen the case and recall Dr. Grigson so he could articulate the basis for his opinion given at the guilt/innocence

stage of trial. Over appellant's objection, the State was permitted to do so, necessitating a recess of duration not reflected in the appellate record, following which the doctor testified that his medical diagnosis of appellant as "a severe sociopathic personality disorder" was based not only upon his personal interview with appellant but also upon various documents provided by the Paris Police Department and the Lamar County Sheriff's Office. Appellant did not cross-examine the doctor further before the jury.

The Texas Code of Criminal Procedure, Article 36.02 provides that:

> The court shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appears that it is necessary to a due administration of justice.

This statute has been construed to mean that a trial judge commits reversible error when he refuses a request to reopen for the purpose of producing relevant and admissible evidence, regardless of its weight or the issue upon which it is offered, so long as the request is timely under the statute and does not threaten to unduly impede the trial. *Vital v. State*, 523 S.W.2d 662, 664–665 (Tex.Cr.App.1975). By this reckoning, had appellant requested an opportunity to reopen under the circumstances presented here, he would have been entitled to do so. *See, e.g., Cain v. State*, 666 S.W.2d 109 (Tex.Cr.App.1984); *Holifield v. State*, 599 S.W.2d 836 (Tex.Cr.App. 1980). We perceive no meaningful difference in application of the statute to evidence offered by the prosecution. *See, e.g., Holcomb v. State*, 523 S.W.2d 661 (Tex.Cr. App.1975); *Boatright v. State*, 472 S.W.2d 765, 770 (1971); *Rodriguez v. State*, 171 Tex.Crim. 476, 350 S.W.2d 854 (1961).

The appellate record reflects that the additional testimony of Dr. Grigson at the punishment phase of trial, although of slight probative value, was nevertheless relevant to a material issue in the case and was offered prior to the inception of oral argument. Moreover, although a recess was evidently required to procure the doctor's testimony, it is not apparent from the record that any significant delay resulted. *Compare Wilkinson v. State*, 423 S.W.2d 311 (Tex.Cr.App.1968) (permitting defendant to reopen would have produced "indefinite delay"). Accordingly, the trial judge did not err in allowing the State to reopen under the circumstances presented here. Appellant's twenty-eighth point of error is overruled.

## XVI.

Finally, in point of error twenty-nine, appellant insists that two items of evidence should have been suppressed because they were seized during an unlawful search of his person. The first is a surface sample taken from appellant's hands by the use of cotton swabs, later tested for the presence of gun powder residue. Testimony regarding seizure of this evidence, including the results of chemical testing which showed no gun powder residue on appellant's hands, was elicited for the first time on cross-examination by the appellant himself. *See Moore v. State*, 163 Tex. Crim. 652, 296 S.W.2d 258, 259 (1956) (introduction of testimony by appellant waives complaint regarding its admissibility). Consequently, the result appellant sought to prevent by his motion to suppress the evidence was instead deliberately brought about by his own interrogation of the police officer, not for the purpose of meeting or rebutting any improperly admitted evidence of the prosecution, but evidently for the purpose of suggesting that appellant had not recently held a firearm in his hands. Accordingly, any error in the trial judge's failure to order suppression of the evidence was cured by appellant's own conduct at trial. *Jackson v. State*, 548 S.W.2d 685, 694 (Tex.Cr.App.1977). *See also Moraguez v. State*, 701 S.W.2d 902 (Tex.Cr.App.1986).

The second item is a roll of money removed from appellant's sock after his arrest. The cash was not discovered during an initial pat-down of appellant when he was taken into custody, but was later found at the Lamar County Sheriff's Office, where he was briefly detained pending

transfer to jail. A police detective decided to search appellant for weapons because, unexpectedly, none had been found on his person earlier. In the course of this search, the officer noticed a bulge in one of appellant's boots, and discovered the roll of cash upon closer examination. Appellant's pretrial motion to suppress this evidence, obtained without benefit of a search warrant, was denied by the trial judge.

■ Both under the Fourth Amendment to the United States Constitution and under Art. I, Section 9 of the Texas Constitution, searches of a person and the area within his immediate control are excepted from the requirement of a warrant when incident to the lawful arrest of such person and otherwise proper in scope. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Carrasco v. State,* 712 S.W.2d 120 (Tex.Cr.App.1986). *Cf. Eisenhauer v. State,* 754 S.W.2d 159, 162 (Tex. Cr.App.1988) (interpretation of TX. CONST., Art. I, § 9 follows interpretation of U.S. CONST., 4th Amend.); *Osban v. State,* 726 S.W.2d 107, 111 (Tex.Cr.App. 1986) (search incident to arrest valid under U.S. CONST. held equally valid under TEX. CONST.).

■ Searches incident to arrest are not limited as a matter of law to those made at the instant a suspect is taken into police custody. *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). Rather, the legal basis for concluding that such searches are reasonable within the meaning of the state and federal constitutions, i.e. to discover weapons, evidence, and contraband, is ordinarily applicable during the entire interval following arrest and leading ultimately either to detention of the suspect or to his release on bail pending formal accusation and trial. *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *Marquez v. State,* 725 S.W.2d 217, 234 (Tex.Cr.App. 1987), and cases cited therein. During this period, detainees suffer a diminished expectation of privacy. When booked into a detention facility, they may be thoroughly searched without a warrant to make an inventory of their belongings. *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). During periods of their detention, they may be subjected routinely to searches for security purposes under circumstances not providing probable cause to believe that a crime has been committed or contraband concealed, again without the necessity of a search warrant. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Given these considerations, we are unwilling to hold that the law permits but one search incident to the arrest and detention of a criminal suspect, or that further searches conducted while the suspect is processed through initial levels of the criminal justice system require the issuance of a search warrant or are subject to more restrictive notions of reasonableness than apply in the case of other searches incident to lawful arrest and detention.

The search of which appellant complains here was made subsequent to an arrest, the legality of which is not challenged, while appellant was still in custody of the arresting officers, and it was therefore subject to usual notions of search incident to a lawful arrest and detention. The trial judge did not err in finding the search to be reasonable under these circumstances and in refusing to suppress the evidence seized. Appellant's twenty-ninth point of error is overruled.

Finding no reversible error in the points appellant has assigned on appeal, the judgment of conviction and sentence of death are therefore affirmed.

CLINTON, Judge, concurring.

Several points pressed by appellant warrant deeper examination and more consideration, in my judgment, though they may not require reversal.

Early on in Texas, as a republic and then a state, without guidance of legislatively enacted specific challenges for cause, judges were left to work with judicial gloss on common law rules as they understood

them from available sources.[1] Even without supporting authority we may surmise that appellate courts were inclined to defer to discretion exercised by trial judges in ruling on objections to particular venirepersons.

Of course, first the Congress and then the Legislature passed substantive and procedural laws governing criminal law matters. See generally contemporaneous volumes of Gammel's Laws of Texas. To provide easier access and understanding, the Constitution of 1845 mandated that the Legislature cause to be revised, digested, arranged and published, all civil and criminal laws. One result is the Old Code, which later served as a pattern for subsequent revisions.[2]

That provisions of civil and criminal statutes are independent of each other in treating challenges for cause, as discerned by Judge W.L. Davidson in *Hunter v. State,* supra, was acknowledged by the Court as late as *Shelby v. State,* 479 S.W.2d 31, at 37 (Tex.Cr.App.1972). But three years later, in *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976), the Court resorted to decisions in civil cases as a rule of decision, *viz:*

"Article 35.16(a), supra, provides that, '(a) A challenge for cause is an objection made to a particular juror alleging some fact which renders him incapable or unfit to serve on the jury …' * * * * We find nothing in the statute which renders these lists an exclusive basis for challenges for cause. *Challenges for cause not based on any ground mentioned in the statute are ordinarily addressed to the sound discretion of the trial judge.* See and cf. *Texas Power and Light Company v. Adams,* 404 S.W.2d 930 (Tex.Civ. App., Tyler 1966—no writ); *City of Hawkins v. E.B. Germany and Sons,* 425 S.W.2d 23 (Tex.Civ.App., Tyler 1968, writ ref, n.r.e.)."

*Id.,* at 669. *Moore* begat progeny such as *Nichols v. State,* 754 S.W.2d 185, at 193 (Tex.Cr.App.1988), relied on by the Court in this cause. Opinion, at 253–254.

Therefore, despite best efforts by our Legislature to particularize grounds for challenging venirepersons for cause, as the opinion of the Court demonstrates, ultimately the ruling is still a matter of discretion in the trial court. Here again then, as the maxim goes, "The more things change, the more they remain the same."

Thus here though not a specified cause, a personal "hardship" renders prospective juror Sherry Haskin "unfit," and amounts to

---

**1.** The Constitution of the Republic enjoined Congress to introduce by statute the common law of England, modified as required by circumstances, and declared that "in all criminal cases the common law shall be the rule of decision," article IV, § 13; it further directed Congress to make laws to exclude from serving on juries persons thereafter convicted of "bribery, perjury, or other high crimes and misdemeanors," General Provisions, § 1. By Act of December 20, 1836, Congress adopted the common law of England insofar as it applied to juries and evidence, and by Act of January 20, 1840, Congress made the common law the rule of decision where not inconsistent with the Constitution and other acts of Congress. Introduction to Constitution of Texas, 3 Vernon's Constitution of the State of Texas 503, at 507.

**2.** Old Code articles 575 and 576, C.C.P., codified certain common law rules, most of which are extant today. There were "principle causes," e.g., prior conviction, unlisted, not qualified, insane, et cetera; "other causes" included relationships, prior grand jury and petit jury service, bias or prejudice regarding accused and preconceived opinion.

Pursuant to Article XVI, § 19, by Acts 1876, p. 83, § 26, the Legislature blended in a general statute reasons that "shall be a good cause for challenge" alike in civil and criminal actions; the 1879 code revision, however, reinstated particular causes for civil and criminal actions, respectively, making "each independent of the other [regarding] qualifications and causes of challenge." *Hunter v. State,* 30 Tex.App. 314, 17 S.W. 414, at 415 (1891). As to causes, compare definitional statement in article 636, C.C.P. 1879 (challenge for cause is objection alleging fact rendering juror incapable or unfit to serve), with article 3080, R.C.S.1879 (challenge for cause is objection alleging fact disqualifying juror from service "or which *in the opinion of the court,* renders him an unfit person to sit on the jury") (my emphasis here and throughout this opinion unless otherwise noted). See, e.g., *Galveston H. & S.A. Ry. Co. v. Thornsberry,* 17 S.W. 521, at 522 (1891) (judge "necessarily clothed with large discretion in this respect"). Same distinction appears in successor articles of revised codes and rules through Article 35.16, V.A.C.C.P., and Tex.R.Civ.P. 228.

something akin to an "excuse sufficient" for the trial judge to uphold State's challenge. Opinion, Part III, at 253–254. That is to say, the ·Legislature really did not intend to require a qualified person to perform one's civic duty to serve as· a juror where the judge is willing to let "excuse" serve as "cause."

Jacquelyn Joy Scott "could never vote to assess as little as five years for the offense of murder," and she withstood "confusion" engendered by exploratory interrogation sufficiently to support a reasonable inference that she adhered to her position stout-

ly enough to warrant the trial judge in sustaining a challenge for cause made by the prosecution, opinion, Part IV, at 254–255, who never would have so much as ·suggested the minimum punishment, for a killing the State alleged constituted capital murder of a peace officer. Sophistry, thy name is now discretion.[3]

Regarding the eighth point of error, the problem is meaning of the last sentence in Article 37.071, § (a): *viz:*

"The state and the defendant or his counsel *shall* be permitted to present

---

**3.** From Old Code articles 575 and 576 through article 616, C.C.P.1925, the dozen or so prescribed challenges for cause, including a conscientiously scrupled venireperson, were available to either side. *Prewitt v. State,* 145 Tex.Cr.R. 202, 167 S.W.2d 194, at 196 (1943); *Taylor v. State,* 131 Tex.Cr.R. 350, 99 S.W.2d 609, at 610 (1936). Not until the 1965 revision of the Code of Criminal Procedure was the Legislature persuaded to recast the format by assigning to the State and accused, respectively, certain challenges for cause; it deliberately took from accused and reserved to the State the cause of conscientious scruples because "no accused could conceivably be injured by having to take such a juror." See Historical Note and Interpretative Commentary following Article 35.16.

Among other allowable causes for which only the State may challenge, the Legislature created a new ground *viz:* a prospective juror who has "a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment." Article 35.16, § (b)3. When the Court found that a trial judge did not err in sustaining a State's challenge for cause to a venireperson who opposes minimum punishment for murder as a lesser included offense of capital murder, *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976), it confessed that "it is difficult to see why the State would challenge the prospective juror on that basis," *id.,* at 669–670). Nevertheless, without resolving the "difficulty," the Court followed *Moore* in e.g., *Bodde v. State,* 568 S.W.2d 344, at 349–350 (Tex. Cr.App.1978); *Chambers v. State,* 568 S.W.2d 313, at 318 (Tex.Cr.App.1978), both also citing *Cherry v. State,* 488 S.W.2d 744, at 751 (Tex.Cr. App.1972).

In *Cherry v. State,* supra, the Court said: "Even though the State was seeking the death penalty, the jurors were properly excused on the State's motion for cause under the provisions of Article 35.16. V.A.C.C.P. *Huffman v. State,* 450 S.W.2d 858 (Tex.Cr.App.1970)." *Id.,* at 751.

Both *Cherry* and *Huffman* were prosecutions for murder with malice aforethought under former penal code provisions. Only in the latter and *sans* authority did the Court express some semblance of rationale, *viz:*

"The reason given by the state for challenging [the venireperson] may seem hard to believe in that notice had been given that the state would seek the death penalty. Yet, that reason may be valid in fact when it is considered that the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony; and it is upon this testimony that the jury must assess the punishment if they find the defendant guilty. It is evidence [sic] that a two-year term is a definite phase of the law which is authorized by the plain provisions of the statute. In our adversary system either a prosecutor or a defendant may, at the close of the evidence in the case be willing to settle for a two-year term *rather than a mistrial because of a hung jury.* The defendant and the state as is shown by the provisions of two sections of the statutes which refer to punishment have the right to have the punishment assessed within the limits prescribed by law after a finding of guilty."

*Id.,* at 861–862. Today that reasoning is inapposite.

Under the late murder statutes there was but one offense, so the Court uniformly held that a verdict finding accused guilty of murder without malice could not be deemed an acquittal of murder with malice and, therefore, no bar to a retrial. *Beckham v. State,* 141 Tex.Cr.R. 438, 148 S.W.2d 1104, at 1106 (1941). Now an acquittal for the higher offense of capital murder would allow a second trial for a lesser offense of which he was convicted or an included inferior offense. Article 37.14, V.A.C.C.P.

Article 35.16 contemplates that the phase of the law in question must be applicable to the case, and no party is *"entitled to rely"* on minimum punishment prescribed for a lesser included offense on sheer speculation that it might become implicated only by risk of mistrial should a venireperson prove to be so steadfastly inflexible in his abstract position. See and compare *Santana v. State,* 714 S.W.2d 1, at 10 (Tex. Cr.App.1986) (no reversible error in restricting voir dire examination as to views on punishment for lesser included offense of murder where evidence failed to raise the issue).

argument for or against sentence of death."

Given that jurors are charged to resolve two or three specific issues, the question naturally arises as to the legislative intendment in mandating that parties be allowed to argue for or against a sentence of death and life imprisonment.

That drafters of the committee substitute the Senate sent to conference drew heavily on related provisions of the Model Penal Code written by the American Law Institute, just as legislators in Florida obviously, and in Georgia to some degree, had done in enacting statutes then extant, has been chronicled in, e.g., *Beets v. State,* 767 S.W.2d 711 (Tex.Cr.App.1988). (Clinton, J., dissenting); see and compare its appendices with *Proffitt v. Florida,* 428 U.S. 242, at 248, 96 S.Ct. 2960, at 2964–2965, 49 L.Ed.2d 913 (1976); *Gregg v. Georgia,* 428 U.S. 153, at 160, 163–164, 193, 96 S.Ct. 2909, at 2919, 2920–2921, 2935, 49 L.Ed.2d 859 (1976); see also *State v. Dixon,* 283 So.2d 1 (Fla.1973), and *Coley v. State,* 231 Ga. 829, 204 S.E.2d 612 (1974).

Thus in *Florida:* "Both the prosecution and the defense may present argument on whether the death penalty shall be imposed." [4] In *Georgia:* "The judge [or jury] shall also hear argument by the defendant or his counsel and the prosecuting attorney ... regarding the punishment to be imposed." [5]

In *Florida* the verdict is only advisory; the actual sentence is decided by the judge. *Id.,* at 248–249, S.Ct., at 2965. In *Georgia* the judge is bound by the sentence recommended by the jury, *id.,* at 166, S.Ct., at 2922, including a binding recommendation of *mercy, id.,* at 197, S.Ct., at 2936.

In context of statutory provisions crafted by legislators in Florida, patently arguments for and against a sentence of death or regarding punishment to be imposed must be related to aggravating and mitigating circumstances that the jury is charged to consider, determine and weigh in making its recommendation. Indeed, the statute expressly provides the jury shall base its recommended sentence to life or death upon considerations of whether sufficient mitigating circumstances outweigh aggravating circumstances. *State v. Dixon,* supra, at 5; see Senate Committee Substitute, § 1(E). General argument on the abstract proposition that capital punishment is or is not a deterrent to crime does not tend to make more or less probable existence of a prescribed aggravating or mitigating circumstance.

Acts 1973, 63rd Leg., Ch. 426, p. 1122, is the product of the Conference Committee on House Bill 200. Concerning the issue being investigated, the conference committee believed it resolved differences between the Senate amendment to the Code of Criminal Procedure to provide "standards for jury consideration of penalty," on one

---

**4.** The Supreme Court paraphrased the pertinent part of the statute in *Florida* as follows:

"... [I]f a defendant is found guilty of a capital offense, a separate evidentiary hearing is held before the trial judge and jury to determine his sentence [of life imprisonment or death]. Evidence may be presented on any matter the judge deems relevant to sentencing and must include matter relating to certain legislatively specified aggravating and mitigating circumstances. *Both the prosecution and the defense may present argument on whether the death penalty shall be imposed."*
*Id.,* at 249, S.Ct., at 2964–2965; see more specifically *State v. Dixon,* supra, and compare with Senate Committee Substitute, § 1(C)–(H).

**5.** The germane part of the Georgia statute read:

"[T]he judge [or jury] shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record

of any prior convictions and pleas of guilty or nolo contendere of the defendant or the absence of any prior conviction and pleas.... The judge [or jury] shall also hear argument by the defendant or his counsel and the prosecuting attorney ... regarding the punishment to be imposed."

The jury is instructed to consider "any mitigating circumstances or aggravating circumstances *otherwise* authorized by law," the scope of which is not delineated in the statute, as well as any of ten statutory aggravating circumstances which may be supported by evidence. *Id.,* at 163–164, S.Ct., at 2920–2921. Remarking that neither side offered additional evidence on punishment, the Supreme Court noticed, "Both counsel, however, made lengthy argument dealing generally with the propriety of capital punishment under the circumstances and with the weight of the evidence of guilt." *Id.,* at 160, S.Ct., at 2919.

hand, and House provision making death penalty mandatory, on the other, by "reduc[ing] number of standards from Senate version." See Analysis of Conference Committee Report appended to my dissenting opinion in *Beets v. State*, supra.[6]

Senate conferees may well have contemplated, and persuaded House conferees, that a relevancy relationship would be still obtain under the "reduced number of standards" as they intended it be between "argument for or against sentence of death" and specific aggravating and mitigating circumstances under their committee substitute. However, we cannot be reasonably confident that the conference committee devised and recommended, and the Legislature adopted, a scheme which bars a deterrence argument.

Replicating that certain unsettled tension between mandatory and discretionary imposition of the death penalty, reflected in e.g., *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), and *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), representatives of respective legislative bodies brought to conference table two diametrical solutions: from the House a bill that called for mandatory sentence of death; from the Senate a committee substitute providing for discretionary assessment of punishment based on weighing aggravating and mitigating circumstances attending the offense and the offender. To resolve their differences conferees ultimately settled on a hybrid form of modified discretionary determination, *viz:* jurors would receive evidence as to "any matter [deemed] relevant to sentence," hear argument for and against sentence of death and then answer two or three special issues "yes" and "no." Article 37.071(a), (b) and (c).

On first impression the Court found that proceeding "limits the standardless imposition of the death penalty," *viz:*

"... It limits the jury's discretion on the range of punishment to life imprisonment or death.... These questions direct and guide their deliberations. They channel the jury's consideration on punishment and effectively insure against the arbitrary and wanton imposition of the death penalty."

*Jurek v. State*, 522 S.W.2d 934, 939 (Tex. Cr.App.1975).

To suggest in argument that, because it does not deter crime jurors ought not to answer the issues in such a way as to preclude imposition of the death penalty, conceivably might invite an exercise of discretion several Justices seemed to deplore in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Yet, having studied *State v. Dixon*, supra, and *Coley v. State*, 231 Ga. 829, 204 S.E.2d 612 (1974), in *Jurek* the late Judge Morrison wrote for the Court that "mere presence of discretion in the sentencing process" is not violative of *Furman v. Georgia, viz:*

"... To eliminate *all* discretion on the part of the jury would be to risk elimination that valuable element which permits individualization based on consideration of all extenuating circumstances and *would eliminate the element of mercy*, one of the fundamental traditions of our system of criminal jurisprudence."

*Id.*, at 940.

Moreover, in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), while the plurality opinion did not address that "element of mercy" in upholding constitutionality of our capital murder statutes, it did reject contentions that "arbitrariness still pervades the entire criminal justice system in Texas," by reference to "the reasons set out in our opinion today in

---

**6.** Actually that "compromise" reworked § 1(D) (general provisions for "separate sentencing proceeding"), *retaining, however, its last sentence allowing "argument for or against sentence of death;"* then it stripped away *all* specifically identified aggravating and mitigating circumstances, and replaced them with three unique special issues bearing little resemblance to former circumstances, either aggravating or mitigating. Compare Senate Committee Substitute, § 1(D), (H) and (I), with added Article 37.071, §§ (a) and (b); see and cf. *Gregg v. Georgia*, supra, n. 4, at 162, S.Ct., at 2920 (express malice is *"deliberate* intention" to take life, and shall be implied "where no *considerable provocation* appears," and n. 9, at 164, S.Ct., at 2921 (aggravated where defendant has *"substantial history of serious assaultive criminal convictions"*).

*Gregg v. Georgia,* 428 U.S., at 199, 96 S.Ct., at 2937." *Id.,* at 274, S.Ct., at 2957. Therein, preliminarily the plurality pointed out, "The existence of these discretionary stages [including exercise of discretion by a jury] is not determinative of. the issues before us," contrasted *Furman,* and confirmed, *"Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution." Gregg v. Georgia,* supra.

In the instant cause appellant began to expound on "two theories of deterrence," specific and general; explaining first that execution of an offender will deter him from crime, but that may also be done by locking him in the penitentiary for his lifetime, counsel urged, "You don't have to be barbaric. You don't have to decide that you will kill to obtain that result." When he turned to "general deterrent," nearly every remark caught an objection which the court sustained. Set out in the margin is the final colloquy in the court below that reveals more clearly the nature and rationale of argument counsel for appellant was precluded from making.[7]

The majority appears to agree the parties may argue for and against sentence of death in the particular case on trial, by asserting how jurors should answer special issues under extant factual circumstances. But, opining that the matter of deterrence is "an empirical question and beyond the factfinding powers [of courts and trial juries]," immaterial and "necessarily means an argument against affirmative answers to the special jury issues," the majority ends its analysis by saying:

"... A juror is not at liberty to answer any of the special issues in the negative based in whole or on part upon the argument appellant wanted to make in this case. Accordingly, there is no basis for concluding that he was entitled to make it."

Opinion at 256–257.

We may grant that such an argument does not directly invoke evidentiary circumstances. However, discretion of jurors in a capital case is not so circumscribed as to exclude the element of mercy, recognized and acknowledged by the Court in *Jurek* to be a fundamental tradition in our criminal justice system. See also *Gregg v. Georgia,* supra, at 197, S.Ct., at 2936 (while authorized to consider aggravating and mitigating circumstances, jury need not find any mitigating circumstance in order to recommend mercy). Thus, like Florida and Georgia, Texas "plainly made an effort to guide the jury in the exercise of its discretion, while at the same time permitting the jury to dispense mercy on the basis of factors too intangible to write into a statute," *Gregg v. Georgia,* supra, (Justice White, concurring in the judgment, *id.,* at 222, S.Ct., at 2947). It seems to me, therefore, that either side may construct a plausible argument that at least alludes to the subject, particularly when in a context of reasonable doubt it is related to the element of mercy.

Nevertheless, the argument being made by appellant is not so subtle. We cannot know whether he was leading the jury to some such point because after the trial court ruled out the notion that capital pun-

7. COUNSEL: Your Honor, we are attempting to make an argument under the Code of Criminal Procedure, 37.071, which says counsel for the defense shall have the right to argue against the imposition of the death penalty.
* * * * * *
THE COURT: You may argue but you may not argue whether it's a deterrent or not a deterrent. The way the court construes the statute is that the legislature has determined that it is an appropriate sentence in those cases where the jury answers yes to the questions submitted and that ends it.
COUNSEL: We are arguing that they are not—that the jury should not answer these questions arbitrarily.

THE COURT: You may argue that, but you may not argue that it is not a deterrent.
COUNSEL: But if we argue that and they think it is a deterrent, how do we get by that, if they say we are going to do it because it's a deterrent?
THE COURT: They are entitled to think that. The legislature has made the decision that it is an appropriate punishment if the facts warrant the answering of those issues 'yes.' And whether it is or is not a deterrent is not a question for the jury.
COUNSEL: But it's something that will be considered by the jury.
THE COURT: No, not considered by the jury.

ishment is not a "general deterrent" he failed to favor the record with any indication of where his argument was going.

With those observations and reservations, I join the judgment of the Court.

DUNCAN, Judge, concurring.

Relative to point of error number eight, the majority concludes that the last sentence in Article 37.071(a), V.A.C.C.P., authorizes a defendant to argue the deterrent effect of the death penalty only within the confines of the case on trial. Implicit within that conclusion is the determination that the statutory authorization that the "state and the defendant or his counsel shall be permitted to present argument for or against the sentence of death," *id.,* does nothing more than grant to the State and the defendant a right they already possessed: the right to argue, on the State's part, that by invoking the death penalty others will be deterred from committing similar crimes; on the defendant's part, the right to argue others would not be so deterred. For example, in *Canedo v. State,* 134 Tex.Crim. 80, 113 S.W.2d 902 (1938), this Court stated:

> We can see no error in the complained of remarks of the State's attorney relative to letting the punishment in this cause be severe enough in order to deter others from committing like offenses. Such is the purpose of the Penal Code and its enactments. Article 2 of the Penal Code says: 'The object of punishment is to suppress crime and reform the offender.' *Id.,* at 904.

Similarly, in *May v. State,* 151 Tex.Crim. 534, 209 S.W.2d 606 (1948), the Court stated: "The district attorney was well within his rights in arguing to the jury that punishment should be such as to deter others from committing similar offenses." *Id.,* at 607.

It cannot be seriously argued that a defendant does not have an absolute right to make the converse argument. Thus, it is obvious to me that when it included the last sentence in Article 37.071(a) the Legislature intended to provide both the State and the defendant with the right to argue something beyond that which they already possessed. That is, the right to argue the propriety or impropriety of the death penalty in general—including the argument that the death penalty is appropriate and necessary because it is a deterrent or that it is not.

The majority opinion will surely be cited properly as authority to contest the State from arguing that the death penalty is a necessary part of our criminal justice system. Conversely, it will also be equally cited to contest the defendant arguing that it is not. This is unfortunate because each argument is appropriate to death penalty cases and renders the legislative authority to make such an argument statutory superfluity.

Even though I think restricting the appellant's argument was error, I also think the error was harmless beyond a reasonable doubt. Rule 81(b)(2), Tex.R.App.Pro. Therefore, I concur.

DAVIS and MILLER, JJ., join.