LEWIS BURKE *v.* THE STATE.*

*(Knoxville.* September Term, 1927.)

Opinion filed, May 28, 1928.

1. CRIMINAL LAW. FRAUDULENT BREACH OF TRUST. DEBTOR OR CREDITOR.

Where one person, by conduct expressed or implied, establishes the relation of debtor and creditor between himself and another, such other would not be guilty of fraudulent breach of trust, if he sold bonds entrusted to him for exchange and appropriated the proceeds to his own use because of his insolvency or inability to pay the debt. (Post, p. 112.)

2. CRIMINAL LAW. FRAUDULENT BREACH OF TRUST. GIST OF THE OFFENSE. AGENT. BAILEE.

If one person accepts bonds under an agreement to exchange them for other bonds, and, in violation of the agreement, sold the bonds so entrusted to him and appropriated the proceeds to his own use, such act would constitute fraudulent breach of trust, as defined by our statute, the gist of the offense being the breach of the trust through misappropriation of the subject-matter by one to whom it is entrusted as agent, actor or bailee, or any other contract or trust by which one was bound to deliver or return the thing received or its proceeds. (Post, p. 112.)

Citing: Sections 6580 and 6582, Shannon's Code; Milbreath v. State, 138 Wis., 354, 131 A. S. R., 1012.

3. CRIMINAL LAW. AGENCY. FRAUDULENT BREACH OF TRUST. CRIMINAL INTENT. GOOD FAITH QUESTION FOR JURY.

If in order to carry out an agency, the defendant had sold bonds entrusted to him for exchange, and was proceeding in good faith, through the use of the proceeds of the sale to acquire other bonds, and was prevented by misfortune or accident from carrying out the contract or agency, the essential element of criminal intent

would be lacking; and this question is one to be submitted and determined by the jury. (Post, p. 113.)

4. CRIMINAL LAW. FRAUDULENT BREACH OF TRUST. FRAUDULENT APPROPRIATION. LARCENY. EMBEZZLE-MENT. TRUST. CONTRACT OF AGENCY. CONSTRUCTION BY TRIAL JUDGE. USAGE AND CUSTOM. QUESTION FOR JURY.

In a trial under an indictment charging (1) fraudulent breach of trust, (2) fraudulent appropriation of personal property, (3) larceny, and (4) embezzlement, where the written contract of agency introduced in evidence, in unequivocal terms created the relation of principal and agent for a specific purpose, it was a question of fact for the jury to determine whether through usage and custom the defendant was authorized to pursue a given course in accomplishing the objects of the agency. (Post, p. 113.)

5. CRIMINAL LAW. FRAUDULENT BREACH OF TRUST. FIDUCIARY CAPACITY. CHARGE TO JURY.

On the trial of an indictment for fraudulent breach of trust, the question of whether bonds were in the possession of the defendant in a fiduciary capacity, and whether they were unlawfully appropriated, must be submitted to the jury, and there was no error. in the charge where the Court told the jury that if the defendant knowingly and wilfully sold certain bonds entrusted to him for exchange, he would be guilty of fraudulent appropriation of the same even though he might at the time have intended ultimately to purchase other bonds, which was followed by an instruction which fully and fairly embodied defendant's theory. The charge must be tested by reference to all its parts. (Post, p. 116.)

6. CRIMINAL LAW. FRAUDULENT BREACH OF TRUST. PRINCIPAL AND AGENT.

In a prosecution under an indictment for fraudulent breach of trust where it appears that an agency was established for the purpose of exchanging certain bonds for certain other bonds; that the defendant, as the agent, sold the bonds entrusted to him for such exchange, misappropriated the proceeds and for a period of thirty days made no effort to buy other bonds for the principal, such conduct would constitute fraudulent breach of trust

within the meaning of our statute, and the fact that there was no appropriation of the bonds delivered to defendant, or that they were sold in good faith with the intention of replacing them, his intention to procure other bonds or account for the proceeds of the bonds so sold is immaterial. (Post, p. 118.)

Citing: Sec. 6580, Shannon's Code; Raine v. State, 143 Tenn. (16 Thomp.), 192.

7. CRIMINAL LAW. MAXIMUM PUNISHMENT. MINIMUM PUNISHMENT. INDETERMINATE SENTENCE. JUDGMENT AMENDED IN SUPREME COURT.

The indeterminate sentence law provides for. an indeterminate sentence of not less than the minimum fixed by statute and not more than the maximum fixed by the jury, so that where a statute fixes only the maximum punishment, the minimum is fixed at one year and when the jury "assessed punishment at" not exceeding five years, the judgment will be amended by the Supreme Court so as to read that the defendant is committed to the penitentiary for an indeterminate term of not less than one nor more than five years. (Post, p. 119.)

Citing: Secs. 6582 and 7206, Shannon's Code; Acts 1913, ch. 8; Acts 1923, ch. 52.

---

*Headnotes 1. Criminal Lew, 16 C. J., section 2275; 2. Embezzlement, 20 C. J., section 85; 3. Embezzlement, 20 C. J., section 83; 4. Embezzlement, 20 C. J., section 82; 5. ————; 6. Criminal Law, 17 C. J., section 3749.

FROM HAMILTON.

Appeal from the Criminal Court of Hamilton County. —HON. C. W. LUSK, Judge.

CARLYLE S. LITTLETON, MARTIN FLEMING, FRANK CARDEN and C. B. HUNTER, for plaintiff in error.

W. B. MILLER and W. F. BARRY, JR., Assistant Attorney-General, for defendant in error,

MR. JUSTICE COOK delivered the opinion of the Court.

This appeal is from a judgment of the Hamilton Criminal Court upon a conviction, July 14, 1927, of fraudulent breach of trust. The indictment found at the September Term, 1921, contained counts charging, (1) fraudulent appropriation of 15 Grand Trunk Railway of Canada Bonds, par value $15,000. (2) Fraudulent appropriation of the proceeds of the bonds. (3) Larceny of the bonds, and (4), their embezzlement. The embezzlement count was dismissed. The jury reported a verdict of not guilty upon the larceny count, and convicted upon the first and second counts.

The facts, presented by the State, upon which the conviction rests are in substance as follows: The Finance Committee of the Volunteer State Life Insurance Company directed its treasurer, Oscar Mather, to have the Grand Trunk Railway of Canada Bonds exchanged for Canadian Northern Bonds, and Mather informed Fred Hahn, an employee of Lewis Burke & Company, of that fact. Defendant being advised by Hahn of the Insurance Company's purpose to exchange the bonds, informed Mather, treasurer of the Company, that he could make the exchange, and Mather assented. The first conversation occurred over the telephone July 13, 1921. July 14th defendant requested delivery of the bonds saying he wanted to ship them to New York. Upon delivery he executed a receipt as follows:

"Chattanooga, Tennessee, July 14, 1921. Received of Volunteer State Life Insurance Company, fifteen one thousand-dollar bonds of the Grand Trunk Railway Company of Canada, issue of twenty-year sinking fund gold debenture 7's due 1940, to be exchanged for like

amount par value Canadian Northern 25 year 6-1/2's bonds.

"Nos. 11489-90-91-92-93; 14434-35-36-37-38-39-40-41-42-43. Lewis Burke & Company, By Lewis Burke."

The defendant wired Lewis Burke & Company's correspondent, Post & Flagg of New York, July 15th that the bonds were being forwarded with sight draft attached. A draft for $18,596.50 attached to the bonds was placed in bank at Chattanooga, discounted and the proceeds immediately deposited to the account of Lewis Burke & Company, and absorbed in whole or in part by outstanding checks of the Company. August first, Mather asked Burke about the bonds and was informed that an exchange had been arranged through Harrison & Company of Philadelphia and that the Canadian Northern Bonds could be expected August 6th. The next inquiry by Mather was August 8th. Defendant replied that he could not understand Harrison & Company's failure to deliver, but that the bonds should arrive not later than the 10th of August. Peremptory demand for delivery was made by Mather August 12th, when defendant replied that the bonds had been sold and the proceeds placed on deposit in the Seaboard National Bank in New York to be used in buying the Canadian Northern Bonds. The Treasurer of the Insurance Company then demanded the money and defendant assured him that the Bonds would be secured in New York and delivered August 13th. August 15th, defendant expressed surprise that the bonds, which he said were shipped from New York on the 13th, had not arrived. Defendant ordered the Canadian Northern Bonds by wire from Post & Flagg of New York on August 15th, 1921. They were forwarded with draft attached and reached Chattanooga on the 17th of August.

When the Canadian Northern Bonds, ordered August 15th from Post & Flagg of New York, reached Chattanooga the insolvency of Lewis Burke & Company had become known and the draft could not be met. Defendant sold the Grand Trunk Railway of Canada Bonds to Post & Flagg July 15th, deposited the proceeds to the account of Lewis Burke & Company as heretofore stated. From July 15th when defendant sold the Grand Trunk Bonds to August 15th, he made no effort, according to the record, to procure the Canadian Northern Bonds.

Spencer D. Wright, a member of the firm of Harrison & Company, testified that he found no record or other evidence that Lewis Burke or Lewis Burke & Company had any transaction with Harrison & Company involving $15,000 of Canada Trunk, or Canadian Northern Bonds.

A representative of the Seaboard National Bank of New York testified that he was unable to find any record of any account maintained by Lewis Burke or Lewis Burke & Company either during the period covering July and August, 1921, or any other time.

Lewis Burke & Company failed August 16th and the schedules of the Bankruptcy Court showed liabilities of $119,732.16, with assets of $3,549.65, adding the personal assets of Lewis Burke and J. L. Greever, members of the firm, a total of $9,594.30.

Defendant did not testify and called no witnesses, but relies on facts and circumstances developed on cross-examination of the State's witnesses, and on exhibits to their testimony, to establish the relation of debtor and creditor as between the Insurance Company and Burke & Company, and the non-existence of his fiduciary relation. It was developed by these means that defendant was associated with two distinct partnerships conducted

at the same place, both styled Lewis Burke & Company, one engaged in the business of commission broker, and the other of investment banker.; and from December 1, 1920, to August, 1921, Lewis Burke & Company, investment bankers, bought, sold or exchanged for the Volunteer State Life Insurance Company securities of the value of more than $375,000. The defendant Lewis Burke had charge of this branch of the business.

Checks exhibited with the record indicate a course of dealing, and a custom between the Insurance Company and Burke & Company whereby in handling securities Burke & Company sold them in the open market, deposited the proceeds to their individual account, and issued checks in settlement with the Insurance Company. The transaction in relation to the $15,000 of Grand Trunk Bonds was distinct from numerous other transactions disclosed by exhibits attached to the record. In a number of them the securities were delivered to the defendant for the purpose of sale and in such cases it followed that upon a sale, settlement would be made by the check of Lewis Burke & Company. In other instances securities were delivered to be exchanged, and where the exchange could not be made direct, it was accomplished through purchase and sale. These transactions do not, however, establish a permanent agency whereby Burke & Company was empowered, by express direction or by implication, to subject the principal's property to the hazards of their own business.

It is insisted that when the $15,000 of Grand Trunk Bonds were delivered by the Insurance Company its representative understood that they were to be handled as other transactions of similar character, and according to the custom of investment bankers. That is, by for-

warding the bonds to Lewis Burke & Company's New York correspondent with draft attached, depositing the proceeds of the draft to the firms checking account subject to the hazards of its business, and the check of Lewis Burke & Company upon its account to be issued in payment for the Canadian Northern Bonds, and by that means accomplish the desired exchange. It is said that by recognizing this custom, the Insurance Company divested itself of the specific property in the bonds and reduced its right to a simple debt for their value.

(1) If the Insurance Company by conduct express or implied established the relation of debtor and creditor between itself and Burke & Company, the defendant would not be chargeable with fraudulent breach of trust because of Lewis Burke & Company's insolvency or inability to pay the debt. (2) But, if acting for Lewis Burke & Company the defendant accepted the bonds under an agreement to exchange them for Canadian Northern Bonds, and in violation of the agreement sold the Grand Trunk of Canada Bonds and appropriated the proceeds to his own use, or to the use of Lewis Burke & Company, such act would constitute a fraudulent breach of trust (*Milbreath* v. *The State,* 138 Wis., 354, 131 A. S. R., 1012), in contemplation of Section 6580 of Shannon's Code, which provides:

"The fraudulent appropriation of personal property or money by any one to whom it has been delivered on deposit, pledge, sequestration, or to be carried or repaired, or in whose hands or under whose control it may be by his position as clerk, agent, actor, or bailee, or on any other contract or trust by which he was bound to deliver or return the thing received or its proceeds, is a fraudulent breach of trust."

By Section 6582, Shannon's Code, it is declared that Section 6580 refers to a receiving with intent to comply with the contract under which delivery was made and a subsequent determination of fraud. The gist of the offense lies in the breach of the trust committed through misappropriation of the subject-matter by one to whom it has been intrusted as agent, actor or bailee, or on any other contract or trust by which he was bound to deliver or return the thing received or its proceeds.

(3) Admitting the right, resulting from custom or from necessity, in order to facilitate the exchange of the securities, of Lewis Burke & Company as agent to sell the bonds to one person and by others to be substituted from another, the Insurance Company did not by the act of delivery for the purpose of exchange divest itself of a proprietary right. There was no intention to convert them into money. They were delivered for exchange only, and the defendant acting for Lewis Burke & Company was onerated by the contract with the duty of accounting for the bonds or their proceeds. If in order to accomplish the object of the agency he had sold the bonds, and was proceeding in good faith through the use of the proceeds to acquire the other bonds, and was prevented by misfortune or accident from carrying out the contract or agency, the essential element of criminal intent would be lacking. This question was submitted and determined by the jury.

(4) Interpreting the receipt given upon delivery of the bonds the trial Judge instructed the jury that the contract contemplated an actual physical exchange of one set of bonds for the other, and the preservation of the Grand Trunk Bonds in the form in which they were received by defendant until they could be delivered simultaneously with the receipt of the bonds for which they

were to be exchanged, and that the means of effecting this exchange was left to the discretion of the defendant so far as concerned the identity of the person with whom the exchange was to be made.

It is insisted that this instruction took from the jury the question of whether the defendant acted pursuant to prevailing custom. The trial Judge was interpreting the contract. The receipt was in writing and in unequivocal terms created the relation of principal and agent for the specified purpose of an exchange. There is no evidence of a subsequent modification. It was not necessary to resort to extraneous evidence to determine the meaning of the contract. It was, therefore, the duty of the trial Judge, not the jury, to interpret the contract. In the absence of subsequent modification, the trial Judge could not read into the contract a variance. It was, however, a question of fact for the jury to determine whether through usage or custom the defendant was authorized to pursue a given course in accomplishing the objects of the agency. That question was submitted to the jury as follows:

"Now it is the theory and insistence of the defendant that he is not guilty of any offense in this case. He admits that he did sign the contract put in evidence by the State, and that the bonds named therein did come into his possession by reason thereof. He further admits that he did sell the bonds and deposited the proceeds to the account of Lewis Burke & Company, in the bank in Chattanooga where he did business. It is his insistence, however, gentlemen of the jury, that he is not guilty either of larceny or fraudulent breach of trust, or of any other offense in this case. He insists that the sale of these bonds was pursuant to a course of dealing theretofore had between himself and the Volunteer State Life

Insurance Company, by which it knew and had been advised that the usual method of effecting exchange of bonds was for him to sell the bonds received from the company for exchange, and with the proceeds to buy other bonds wherever they might· be found, and at the most favorable figure. He insists· that by a long course of dealing between himself and the insurance company, the insurance company knew of this practice on his part; that such practice was contemplated by the parties, and entered into and became a part of the contract between them. It is his further insistence that he received the bonds in good faith, sold them in good faith,. and was in good faith negotiating with outside parties for the bonds called for in exchange in the contract; and would have furnished the said bonds had not his failure been brought about by a falling market and the actions of other parties beyond his control.

"If upon all the proof you find this insistence. to be established, or if you have a reasonable doubt as to its truth, it will be your duty to acquit the defendant."

It does not appear from the record that the Insurance Company knew that defendant had ever used or would use the bonds intrusted to him for exchange until after the bankruptcy of Lewis Burke & Company. When the bonds were delivered on July 15th, the bank account of Lewis Burke & Company was overdrawn or at least there were outstanding checks to be taken care of, and the Grand Trunk Bonds were sold and the proceeds devoted to the use of Lewis Burke & Company to avoid· or postpone impending failure.

A delay of thirty days followed throughout which the defendant made no effort to account for the proceeds of the bonds or to replace them with the Canadian Northern .Bonds. In· the meantime he made false and contra-

dictory statements to the Insurance Company explanatory of his failure to account for the bonds, after the appropriation was made and the money of the Insurance Company applied on checks of Burke & Company. These facts establish the unlawful intent.

(5) The question of whether the bonds were in possession of defendant in a fiduciary capacity, and whether they were unlawfully appropriated was submitted in the following intruction to the jury:

"By referring to Section 6580 of the Code, quoted above, it will be seen that this offense arises upon the violation of some trust or fiduciary capacity into which the defendant had theretofore entered. Manifestly this offense cannot be committed unless some trust or fiduciary capacity relation exists between the defendant and the party alleged to have been defrauded. By Section 6583, quoted above, the distinction between larceny and fraudulent breach of trust is stated to be that in larceny the fraudulent intent exists at the time the goods are received; while in fraudulent breach of trust the property is received on a contract, in good faith, and the fraudulent intent arises and is executed later.

"It is the theory and insistence of the State that the defendant knowingly and wilfully departed from the terms of the contract and sold the Grand Trunk bonds without the knowledge and consent of the insurance company with respect to that or any previous, similar contract of exchange. And I charge you as a matter of law that if the defendant did knowingly and wilfully sell the bonds, he would be guilty of a fraudulent misappropriation of the same, even though he might at the time have intended ultimately to purchase other bonds for the insurance company. In other words, the matter of the defendant's intent at the time of such misappropri-

ation, if he did misappropriate the bonds, would not be material. And if you find beyond a reasonable doubt that after he secured possession of the bonds upon the contract, as insisted upon by the State, he did either appropriate the bonds, or their proceeds, to his own use, he would be guilty of a fraudulent breach of trust, and you should convict him of that offense."

It would be difficult, indeed impossible, to present different theories or separate propositions in a single statement. The mechanism through which ideas find expression imposes its limitations, so the charge must be tested by reference to all its parts. The instruction last quoted, if considered without reference to the entire charge would be objectionable in that the Court told the jury that if the defendant did knowingly and wilfully sell the bonds he would be guilty of a fraudulent appropriation of the same even though he might at the time have intended ultimately to purchase other bonds, but this was followed by an instruction which fully and fairly embodied the defendant's theory, and avoided prejudicial error.

The issue was presented to the jury, (1) whether or not the Insurance Company divested itself of a proprietary right to the bonds or other proceeds when they were delivered to the defendant, and clothed him or his company with title, and established the relation between them of debter and creditor instead of principal and agent. (2) Whether or not in consequence of a prevailing custom Lewis Burke and Company or the defendant, acting for his firm, was authorized to sell instead of exchange the bonds and use the proceeds to substitute the others, and whether the defendant was in good faith proceeding to complete the transaction according to the understanding between the parties, and was defeated in his object by the bankruptcy of Lewis Burke & Company.

The defendant's propositions in whatever form presented through the numerous assignments of error reduce themselves to these two propositions. The jury found against the theory of the defendant and the evidence does not preponderate against their verdict.

(6) It does not appear from the record that the Insurance Company knew that either defendant or Lewis Burke & Company had used its securities or their proceeds intrusted to them as agent, until after the bankruptcy of Lewis Burke & Company. The evidence does not sustain the theory that the Insurance Company divested itself of its proprietary right in the bonds or their proceeds, or that the nature of the transaction was such as to create the relation of creditor and debtor.

Admitting the custom and Burke's intention to accomplish the exchange by a sale of the Grand Trunk Railway of Canada Bonds, the proof clearly establishes the fact that he was intrusted with the bonds as an agent under a contract by which he bound himself to return them or their proceeds. His intention to procure the Canadian Northern Bonds or to account for the proceeds of the Grand Trunk Railway of Canada Bonds is immaterial, it clearly appearing that he without authority appropriated the proceeds of the bonds on the day after their receipt.

"No matter how good the intention of the defendant may be at the time of such fraudulent misappropriation, and no matter how honestly he intends to return the money which he fraudulently misappropriates, the offense under the statute is made out, and it is not essential or necessary to prove any intent on his part to deprive the owner of his property." *Raine* v. *State*, 143 Tenn., 192.

We have very carefully considered all of the assignments of error and with much care have gone through the evidence. Admitting that there was no appropriation of the bonds; that the Grand Trunk Bonds were sold in good faith with the intention of replacing them, the evidence sustains the conclusion that the proceeds of the bonds were misappropriated on the day after delivery for exchange and no effort made for thirty days to buy others. Such an Act would constitute fraudulent breach of trust within the meaning of Section 6580 of Shannon's Code. The judgment is affirmed.

(7) The Statute, Section 6582 of Shannon's Code, prescribing punishment for fraudulent breach of trust fixes the maximum of not exceeding ten years in the Penitentiary without fixing a minimum. Not being fixed by this Statute the minimum punishment is determined by reference to Section 7206 of Shannon's Code which forbids commitment for less than twelve months. The Indeterminate Sentence Law, Chapter 8, Acts 1913, provides for an indeterminate sentence of not less than the minimum fixed by Statute, and not more than the maximum assessed by the jury. See Chapter 52, Acts 1923.

The jury assessed defendant's punishment at not exceeding five years in the Penitentiary, and the judgment of the Court followed the verdict. In order that the sentence may conform to the Statutes referred to, it is directed that the judgment be amended to read that defendant is committed to the State Penitentiary for an indeterminate term of not less than one nor more than five years.