

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| BRYAN JAMAL DUNN, | § | No. 08-23-00040-CR |
| Appellant, | § | Appeal from the |
| v. | § | 264th Judicial District Court |
| THE STATE OF TEXAS, | § | of Bell County, Texas |
| Appellee. | § | (TC# 82899) |
| | § | |

## MEMORANDUM OPINION

A jury found Appellant Bryan Jamal Dunn guilty of one count of capital murder in the shooting death of Luis Eddie Cosme, and the trial court gave him a mandatory life sentence without parole.[1] In two issues on appeal, Appellant contends the trial court erred by refusing to give his requested instruction on the lesser-included offense of manslaughter, and by failing to *sua sponte* give the jury an instruction cautioning it to not be influenced by sympathy, prejudice, or bias in reaching its verdict. For the reasons set forth below, we affirm.

---

[1] This case was transferred from our sister court in Austin pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the Austin Court's precedent to the extent it conflicts with our own. *See* TEX. R. APP. P. 41.3.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Background facts and the shooting

Beginning in 2016 when living in Killeen, Appellant became involved in a relationship with Estela Cosme (Estela), the ex-wife of the victim, Luis Eddie Cosme (Eddie). At the time of the shooting on October 30, 2019, Estela was living with Eddie and his son (Emilio) in Killeen, despite Estela and Eddie's 2018 divorce. Appellant was in the Air Force stationed in Washington, D.C.

Estela described her relationship with Appellant as "on and off" and fraught with arguments over Appellant's relationships with other women. She recalled Appellant grabbing her by the arm and bruising her wrists during an argument in April 2019. Estela recalled Appellant grabbing her by the neck and threatening to smother her with a pillow on October 22, 2019, while she was visiting him in D.C., telling her no one would care if he murdered her. Estela did not report the incident for fear of jeopardizing Appellant's career; instead, she told Appellant she no longer wished to see him then flew home to Killeen on October 28.

Appellant followed Estela to Killeen, where his parents lived, and began sending her messages in an attempt to mend their relationship, which she rejected. After Appellant refused to leave her alone, Estela called the police on the evening of October 30 to inquire about getting a protective order. After she described the incident in D.C., the police advised her to come to the station to make a report.

Estela and Eddie left for the police station and intended to stop at Appellant's parents' house to speak with them about the situation. However, they returned home when they observed cars they did not recognize parked in front of Appellant's parents' house.

As they returned home, Estela observed a car pull into one of their two garages and Appellant exit the car. Estela recalled Eddie asking Appellant to leave, but Appellant refused. In an attempt to diffuse the situation, Estela asked Eddie to go inside to get her jacket, whereupon she tried to convince Appellant to leave, but again he refused. According to Estela, at some point she ran through the garage and into the house, trying to close the door to prevent Appellant from entering. After yelling to Eddie for help, he came and attempted to help close the door. Appellant, who was larger than Eddie, pushed the door open, and Estela observed Appellant holding a gun. Estela recalled Appellant then shot Eddie twice at close range, and she saw Eddie fall to the ground. Fearing for her life, she unwillingly got into the car with Appellant, and they drove away from the scene.

Emilio, who was 16 years old at the time, testified he was in the home during the shooting and confirmed the sequence of events as described by Estela. Emilio had met Appellant on several prior occasions, as Appellant often stayed at the house when his father, a long-haul truck driver, was out of town. Emilio described Estela's relationship with Appellant as "toxic," testifying about their constant arguments, bruising on Estela's arms, and messages his father showed him from Appellant making threats against the family, including threatening to kill his father. Emilio recalled being in his room the night of the shooting when he heard Appellant arguing with Estela in front of the house. Given his belief that Appellant was a "fairly dangerous" individual, Emilio went to the kitchen to get a knife in case he needed to protect himself.[2] As he walked through the hallway, he heard Estela screaming Eddie's name and observed his father trying to close the door to the

---

[2] Emilio also testified that he believed Appellant had slashed the tires of one of the family's cars the day before the shooting, but there was no clear evidence linking Appellant to that incident.

garage as Appellant was approaching him, holding what Emilio believed was a gun. Emilio recalled Appellant "slammed open the door," and immediately thereafter, he heard shooting and saw his father hold his chest and fall to the ground. Emilio fled to his room, fearing Appellant might come after him, and looking through his window, he observed Appellant force Estela into his car. After seeing the car drive away, he went downstairs. And after determining that his father showed no signs of life, he called 911 and ran to a neighbor's house for help.[3]

The medical examiner who performed the autopsy on Eddie's body testified that Eddie suffered two gunshot wounds. One gunshot wound, which the examiner described as fatal, entered through the front of Eddie's body, went through his aorta, and exited his back. The second gunshot wound, which the examiner described as potentially fatal, entered through Eddie's back, went through his lungs, and exited near the base of his neck. Although both bullets exited Eddie's body, the examiner was able to extract a bullet fragment from Eddie's lungs. The medical examiner could not say what range the shots were fired from, or whether the shots were fired accidentally, recklessly, or intentionally, but was able to positively conclude the shots came at the hands of a third party and the cause of Eddie's death was homicide.

### B. The police investigation

Estela testified that while she was in Appellant's car after the shooting, she observed a gun on the driver's side floor as well as a taser. During the drive, Appellant called a friend, stating: "I f--ked up, I killed someone." Estela recalled Appellant stopping at an ATM to get money and suggesting places to which they could flee. Fearing for her life, she played along, convincing him

---

[3] The police also recovered surveillance video from both the Cosme home and the neighbor's home, which was played for the jury, confirming the sequence of events as described by both Estela and Emilio.

4

to let her out at a hotel in Round Rock after telling him she would get him money and they could be together later.

The police were summoned to the hotel, where Estela described the car Appellant had been driving. They were able to locate it in Killeen on October 31 in the early morning. After a short high-speed chase, the police pulled Appellant over and arrested him. At the arrest, the police bagged Appellant's hands, and subsequent testing revealed he had gunshot residue on both hands. Eddie's blood was also found on Appellant's shoes at the time of his arrest.

During a search of the car, the police found a loaded gun on the driver's side floor, a taser or stun gun, and a box of ammunition. The police also found two sales tickets from a pawnshop in Killeen indicating Appellant had purchased the gun, the ammunition, and the taser earlier that day. At trial, a pawnshop employee testified—as confirmed by the store's surveillance video—that Appellant had made the purchase at 4:46 p.m. the day of the shooting, and the serial number on the gun found in the car matched the serial number of the gun Appellant had purchased that day. He further testified the sale was lawful, and Appellant had provided his driver's license for the purchase, which listed his father's address in Killeen.

The police recovered a bullet from the garage where Eddie had been shot, and forensic testing revealed that the bullet as well as the bullet fragment recovered from Eddie's body came from the gun found in Appellant's car. Forensic testing also revealed Appellant's DNA on the gun's trigger.

### C. Court proceedings

Following his arrest, a grand jury indicted Appellant for capital murder, alleging he intentionally caused Eddie's death by shooting him with a deadly weapon, namely a firearm, and

did so "in the course of committing or attempting to commit the offense of Burglary of a Habitation of [Eddie], who was the owner of said habitation." At trial, the court instructed the jury on the elements of capital murder and on the State's theory that Appellant had committed burglary by entering or attempting to enter the Cosme residence with the intent to commit aggravated assault. The trial court also instructed the jury on the lesser-included offense of intentional murder but refused Appellant's request for an instruction on the lesser-included offense of manslaughter.

Following a week-long trial, the jury found Appellant guilty of capital murder. The trial court imposed a mandatory life sentence without the possibility of parole. This appeal followed.

## ISSUES ON APPEAL

Appellant raises two issues on appeal. In issue one, he contends the trial court erred by refusing to give the jury his requested instruction on the lesser-included offense of manslaughter. In issue two, he contends the trial court committed egregious error by failing to *sua sponte* give the jury an instruction cautioning it against allowing bias, prejudice, or sympathy to influence its verdict.

## REQUEST FOR A MANSLAUGHTER INSTRUCTION

As to Appellant's contention that the trial court erred in refusing his request for a jury instruction on the lesser-included offense of manslaughter, Appellant failed to establish he was entitled to such an instruction.

### A. Standard of review and applicable law

The Texas Court of Criminal Appeals "has implemented a two-step test to determine when a charge on a lesser included offense should be given," referred to as the *Aguilar/Royster* test. *See Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998) (en banc) (citing *Aguilar v. State*, 682

6

S.W.2d 556, 558 (Tex. Cr. App. 1985) (en banc); *Royster v. State*, 622 S.W.2d 442, 444 (Tex. Crim. App. [Panel Op.] 1981) (plurality opinion)); *see also Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012) (discussing two-step inquiry). The first step is to determine whether the offense comes within Article 37.09 of the Texas Code of Criminal Procedure, which provides that a "lesser included offense must be included within the proof necessary to establish the offense charged." *Moore*, 969 S.W.2d at 8; *see also Cavazos*, 382 S.W.3d at 382. We compare the elements of the offense as alleged in the indictment with those of the requested lesser offense. *State v. Meru*, 414 S.W.3d 159, 162 (Tex. Crim. App. 2013). This is a question of law independent of the evidence produced at trial. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011); *see also Meru*, 414 S.W.3d at 162.

If step one is met, the court "consider[s] whether a rational jury could find that, if the defendant is guilty, he is guilty only of the lesser offense." *Meru*, 414 S.W.3d at 163 (citing *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007); *Rousseau*, 855 S.W.2d at 673). This is a factual determination based on the evidence presented at trial. *Id.* "If there is evidence that raises a fact issue of whether the defendant is guilty only of the lesser offense, an instruction on the lesser-included offense is warranted, regardless of whether the evidence is weak, impeached, or contradicted." *Id.* (citing *Cavazos*, 382 S.W.3d at 383). "[A]nything more than a scintilla of evidence may be sufficient to entitle a defendant to a charge on a lesser offense." *Cavazos*, 382 S.W.3d at 385; *see also Meru*, 414 S.W.3d at 163. Nevertheless, the evidence supporting an instruction on a lesser-included offense "must still be directly germane to the lesser-included offense[.]" *Cavazos*, 382 S.W.3d at 385; *see also Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003) (en banc) (evidence must be "directly germane" to lesser-included offense

before an instruction on a lesser-included offense is warranted). Further, this "threshold requires more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Cavazos*, 382 S.W.3d at 385.

**B. Step one: manslaughter is a lesser-included offense of capital murder**

Appellant contends and the State appears to concede the offense of manslaughter meets the criteria for a lesser-included offense of capital murder. We agree.

A person commits capital murder if he "commits murder as defined under Section 19.02(b)(1) [of the Penal Code] and…[he] intentionally commits the murder in the course of committing or attempting to commit . . . burglary . . ." TEX. PENAL. CODE ANN. § 19.03 (a)(2).[4] In turn, § 19.02(b)(1) of the Penal Code defines "murder" as "intentionally or knowingly caus[ing] the death of an individual." TEX. PENAL. CODE ANN. § 19.02 (b)(1). And the Penal Code provides that a "person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result," while a "person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *See* TEX. PENAL. CODE ANN. § 6.03 (a)(b) (defining culpable mental states).

On the other hand, a person commits the offense of manslaughter "if he recklessly causes the death of an individual." TEX. PENAL. CODE ANN. § 19.04. And in turn, the Penal Code provides

---

[4] The trial court also instructed the jury that a person "commits the offense of burglary, if, without the effective consent of the owner, the person enters a habitation with intent to commit an aggravated assault," which it defined as "intentionally, knowingly, or recklessly caus[ing] bodily injury to another," or "intentionally or knowingly threaten[ing] another with imminent bodily injury." *See* TEX. PEN. CODE ANN. § 30.02 (defining the offense of burglary); TEX. PENAL. CODE ANN. § 22.01 (defining the offense of assault).

that a "person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." TEX. PENAL. CODE ANN. § 6.03(c).

Accordingly, manslaughter has the same elements as murder and capital murder, i.e., that the defendant caused a death, but it has a different mens rea requirement, only requiring the State to prove the defendant acted "recklessly," rather than "intentionally or knowingly," thereby making it a lesser-included offense of murder as well as capital murder. *See McKinney v. State*, 207 S.W.3d 366, 370 (Tex. Crim. App. 2006) (recognizing that the elements of manslaughter and murder are the same with the exception of the defendant's mental state); *Cavazos*, 382 S.W.3d at 384 (recognizing that the difference between murder and manslaughter is "intent versus recklessness" and that manslaughter is therefore a lesser-included offense of murder).

## C. Step two: the record contains no evidence of recklessness

The State contends Appellant failed to satisfy the second step in the *Aguilar/Royster* test due to his failure to point to any evidence to establish that, if he was guilty, he was only guilty of manslaughter. We agree.

### (1) Error preservation

First, the State argues Appellant failed to preserve error with respect to this argument because he did not point to any "specific evidence" to support his request for a manslaughter instruction when he made his request in the trial court. The question of whether error was preserved depends in part on the nature of the instruction. In general, a trial court has the duty to properly instruct the jury on the "law applicable to the case." *See* TEX. CODE CRIM. PROC. ANN. art. 36.14

9

(a trial court shall give the jury "a written charge distinctly setting forth the law applicable to the case"); *see also Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007) (recognizing the trial court's duty to instruct the jury on the law that applies to the case and to "guide them in its application to the case"). A trial court's "duty to instruct the jury on the law applicable to the case exists even when defense counsel fails to object to inclusions or exclusions in the charge [and] this may require the judge to *sua sponte* provide the jury with the law applicable to the case." *Taylor v. State*, 332 S.W.3d 483, 486 (Tex. Crim. App. 2011). However, a trial court has no duty to *sua sponte* instruct the jury on unrequested defensive issues, as an unrequested defensive issue is not the law applicable to the case. *Id.* at 487 (citing *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998); *see also Williams v. State*, 662 S.W.3d 452, 460–62 (Tex. Crim. App. 2021), reh'g denied (Aug. 24, 2022) (discussing distinction between instructions to the jury explaining the "law applicable to the case," which must be given *sua sponte*, and defensive instructions, which must be requested). And lesser-included offense instructions are defensive instructions, which must be expressly requested by the defendant at trial. *Williams*, 662 S.W.3d at 460.

Accordingly, unrequested defensive instructions are subject to ordinary rules of procedural default, and a "defendant cannot complain for the first time on appeal about the lack of a defensive instruction absent preservation of the error." *Id.* at 461 (citing *Posey*, 966 S.W.2d at 61–62); *see also* TEX. R. APP. P. 33.1 (to preserve error, a party must make a timely, specific complaint to the trial court, with specific grounds for the ruling sought, unless apparent, and secure a trial court ruling or refusal to rule). To preserve error in this instance, Appellant had to point to specific evidence in the record he believes would allow a jury to conclude he was guilty only of the lesser-included offense and not the charged offense. *Id.* at 460–62. Doing so both "(1) [] informs the

judge of the basis of the objection and affords him an opportunity to rule on it and (2) [] affords opposing counsel an opportunity to respond to the complaint." *Id.* at 460 (quoting *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015)).

The trial court only errs in refusing to submit an instruction on a lesser-included offense when either "the defendant points to the specific evidence that negates the greater offense but supports the lesser offense," or when "such specific evidence is manifest," i.e., when "the grounds for the instruction are obvious to the court and opposing counsel." *Id*. at 462 (citing TEX. R. APP. P. 33.1(a)(1)); *see also Adanandus v. State*, 866 S.W.2d 210, 232 (Tex. Crim. App. 1993) (to be entitled to a manslaughter instruction, defendant had to point to "evidence in the record from which a rational jury could infer that appellant's actions were merely reckless and were *not* intentional").

Here, Appellant failed to point the trial court to any specific evidence supporting his request for a manslaughter instruction. At the charge conference, Appellant's attorney requested the instruction, stating, "based on the evidence and facts and circumstances . . . the jury could reasonably determine that this was a reckless killing." In response, the prosecutor argued there was no evidence to support that the killing was reckless. Appellant did not reply to the State's argument, and the trial court denied the request. Accordingly, we must consider whether evidence of recklessness would have been "obvious" such that it was sufficiently "manifest" to preserve error. We conclude it was not.

**(2) No evidence to support a finding Appellant acted recklessly**

Appellant argues the record contains specific evidence of his recklessness in two ways. First, the medical examiner who conducted the autopsy testified that he could not determine whether the shooting was committed in an intentional, reckless or accidental manner, or what

motivated the shooter. Appellant, however, cites no authority for the proposition that a medical examiner would be competent to testify regarding a shooter's mental state or motivation, nor are we aware of any. To the contrary, as the medical examiner testified at trial, it was not within the province of his role to make any such determination.

Second, he lawfully purchased the gun used in the shooting, and he contends he would not have done so if he intended to commit the murder. Even if the lawful purchase were to suggest he had no intent to kill Eddie at the time of the purchase, this would not support a finding Appellant acted recklessly at the time of the shooting. The key question in determining a defendant's mental state is the intent he had at the time the offense was committed. *See Fuentes v. State*, 991 S.W.2d 267, 273 (Tex. Crim. App. 1999) ("what appellant anticipated before the offense is inconsequential; the issue is whether there is any evidence that appellant did not intend to kill [his victim] at the time he shot him") (citing *Rousseau*, 855 S.W.2d at 674) ("[t]he possibility that initially or at some point during the commission of the robbery the offender did not have an intent to cause death does not amount to evidence that the offender did not intend to cause the victim's death when the murder was committed").

At the time of the shooting, the evidence does not rationally support a finding that Appellant acted recklessly rather than intentionally. The undisputed eyewitness testimony established that after a short argument with Eddie and Estela, in which he refused to leave the Cosme residence, Appellant forced his way into the home carrying a gun then shot Eddie twice at close range. Appellant thereafter fled the scene with Estela and called a friend to say that he had "f—ed up" and killed someone. The Texas Court of Criminal Appeals, in a similar situation, noted "Pulling out a gun, pointing it at someone, pulling the trigger twice, fleeing . . . , and later telling

12

a friend 'I didn't mean to shoot anyone' does not rationally support an inference that Appellant acted recklessly at the moment he fired the shots." *Cavazos*, 382 S.W.3d at 385; *see also Fuentes*, 991 S.W.2d at 273 (where evidence showed appellant ran up to his victim, shot him twice in the chest, and then fled the scene, there was no evidence from which "a jury could rationally have found that appellant did not intend to kill when he shot the deceased"). No specific evidence—let alone manifest or obvious evidence—in this record supported Appellant's request to the trial court for a manslaughter instruction.

Accordingly, Appellant failed to preserve error, and we overrule Appellant's first issue.

## THE ANTI-SYMPATHY/ANTI-BIAS INSTRUCTION

Regarding Appellant's contention the trial court committed egregious error by failing to *sua sponte* instruct the jury not to "let bias, prejudice, or sympathy play any part in your decision," Appellant failed to show the court erred. And even if the court had erred in that regard, there would have been no harm warranting reversal.

### A. Standard of review and applicable law

As set forth above, a trial court must provide the jury a written charge distinctly setting forth the law applicable to the case. *See Maciel v. State*, 631 S.W.3d 720, 722 (Tex. Crim. App. 2021). We analyze a jury-charge issue utilizing a two-pronged test: first, we determine whether there was error, and if so, we determine whether the error caused sufficient harm to warrant a reversal. *Almanza*, 686 S.W.2d at 171 (Tex. Crim. App.1984); *see also Torres v. State*, 543 S.W.3d 404, 414 (Tex. App.—El Paso 2018, pet. ref'd) (*citing Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). "The amount of harm necessary to warrant a reversal depends on whether the appellant objected to the jury charge." *Torres*, 543 S.W.3d at 414 (citing *Ngo*, 175 S.W.3d at

13

743; *Almanza*, 686 S.W.2d at 171). *See also Williams*, 662 S.W.3d 452, 460 (observing that "if a defendant complains on appeal about an erroneous instruction (or lack of a proper instruction) regarding an area of the law that is considered the law applicable to the case, the objection (or lack thereof) determines the applicable standard for assessing harm"). If a proper objection was made at trial to an error in the jury charge, reviewing courts determine whether the error caused the defendant some harm. *Williams*, 662 S.W.3d at 460. But if no objection was made, reviewing courts determine whether the error caused the defendant egregious harm. *Id.* at 460-461.

**B. Analysis**

Here, Appellant did not request an instruction cautioning the jury not to let sympathy, prejudice or bias influence the verdict, but he contends such instruction is the "law applicable to the case." He argues the trial court therefore had the duty to give the instruction to the jury *sua sponte*, and its failure to do so constituted egregious harm.

As the State points out, and Appellant acknowledges, there is little, if any, case law directly addressing whether such an instruction is required during the guilt-innocence phase of a jury trial. Instead, an anti-sympathy/bias instruction is one the Texas Court of Criminal Appeals has recognized is appropriate—and perhaps even required—during the sentencing phase in accordance with the Eighth Amendment. *See McFarland v. State*, 928 S.W.2d 482, 522 (Tex. Crim. App. 1996) (en banc), *abrogated on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998) (en banc). The *McFarland* Court recognized the United States Supreme Court's statement that it is "no doubt constitutionally permissible, *if not constitutionally required,* for the State to insist that the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating

14

evidence (emphasis in the original)."[5] *Id.* (quoting *Saffle v. Parks*, 494 U.S. 484, 490 (1990)); *see also Tong v. State*, 25 S.W.3d 707, 710–11 (Tex. Crim. App. 2000) (en banc) (holding that, at sentencing, "anti-sympathy charges are appropriate in that they properly focus the jury's attention on those factors relating to the moral culpability of the defendant").

Here, however, Appellant is not arguing the trial court should have given this instruction during the sentencing phase of his trial—and indeed there was no such sentencing phase, as the trial court imposed the mandatory life sentence without the possibility of parole immediately after the jury entered its verdict. And Appellant has cited no cases, nor are we aware of any, in which a trial court was *required* to give such an instruction during the guilt-innocence phase of a trial or that the failure to give such an instruction constitutes error. To the contrary, while such an instruction may be helpful in certain cases during the guilt-innocence phase to ensure the jury is not influenced by improper emotions, it is generally recognized that "ordinary people" will not infer a defendant's guilt simply because of sympathy for the victim or the victim's family.[6]

Appellant nevertheless asserts that an anti-sympathy/bias instruction was warranted during the guilt-innocence phase of his trial for two reasons. To begin with, he cites to the general

---

[5] In *McFarland*, the trial court instructed the jury: "You are further instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling in considering all the evidence before you in answering the special issues." *See McFarland v. State*, 928 S.W.2d 482, 522, n. 50 (Tex. Crim. App. 1996) (en banc).

[6] *See, e.g.*, *Garcia Martinez v. State*, No. 13-96-259-CR, 1997 WL 33642932, at *12 (Tex. App.—Corpus Christi– Sept. 4, 1997, no pet.) (not designated for publication) (observing that because "ordinary people" will not infer a defendant's guilt based solely on feelings of sympathy for the victim or the victim's family, the presence of victim's infant child in the courtroom during trial did not cause unfair prejudice to the defendant or inflame the minds of the jurors, particularly where the jury was instructed that bias, prejudice, and sympathy were not to be a part of its deliberations, and where the prosecutor made no reference to the child during arguments (citing *Rogers v. State*, 774 S.W.2d 247, 258 (Tex. Crim. App. 1989), *overruled on other grounds by Peek v. State*, 106 S.W.3d 72 (Tex. Crim. App. 2003) (recognizing that it is possible for "ordinary people to feel sympathy for the victims of crime and for their relatives without inferring that the presumably innocent person on trial is therefore guilty as charged")).

principle that a criminal defendant is entitled to a "fair trial by a panel of impartial, 'indifferent' jurors," and the failure to "accord an accused a fair hearing violates even the minimal standards of due process." *See generally Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citing *In re Oliver*, 333 U.S. 257 (1948)); *see also Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992) (recognizing that "[t]he right to an impartial jury trial is secured by the Sixth Amendment and by the Due Process Clause of the Fourteenth Amendment"). The cases Appellant cites discuss this general principle but are inapposite in that they address reversing a defendant's conviction when there is evidence a jury was not comprised of impartial jurors, such as when the jurors were unduly influenced by pretrial publicity or improper contacts with the State's witnesses.[7] None of this precedent requires the trial court to provide an anti-sympathy/bias instruction during the guilt-innocence phase of a defendant's trial as part of the law applicable to the case, nor does it suggest the failure to do so constitutes egregious error.

Appellant also unsuccessfully relies on our sister court's holding in *Curtis v. State*, 89 S.W.3d 163 (Tex. App.—Ft. Worth 2002, pet. ref'd) to support his position that such an instruction was required. In *Curtis*, the court held that the trial court erred by admitting evidence of an extraneous offense committed by the defendant, finding its admission was unfairly prejudicial to the defendant, as it "invited the jury to convict [him] on a moral or emotional basis rather than as a reasoned response to the relevant evidence." *Id.* at 176. In reversing the defendant's conviction,

---

[7] *See, e.g., Turner v. State of La.*, 379 U.S. 466, 474 (1965) (reversing defendant's conviction where jurors were permitted to fraternize with two key prosecution witnesses who were deputy sheriffs assigned to act as their "official guardians" during the trial); *Morgan v. Illinois*, 504 U.S. 719, 739 (1992) (reversing the defendant's conviction where the "inadequacy of *voir dire*" to ensure the jurors would not automatically impose the death sentence upon the defendant's conviction for murder led the Court to doubt the jury was empaneled in compliance with the Fourteenth Amendment); *Tumey v. State of Ohio*, 273 U.S. 510, 535 (1927) (reversing defendant's conviction where city's mayor, who had a pecuniary interest in the outcome of the trial, improperly served as the trier of fact).

the court noted that the possibility of unfair prejudice was "especially true in this case where, even though Appellant objected to the [evidence] and requested an instruction, the trial court refused to include language in the charge instructing the jury not to let bias, prejudice, or sympathy enter into its deliberations . . . [.]" *Id*. at 176-77.

The court in *Curtis*, however, did not have the issue before it, as we do, of whether—standing alone—the trial court was required to provide the jury with an "anti-sympathy/bias" instruction, and instead only observed that such an instruction would have been helpful to avoid the effects of the admission of the improper extraneous offense evidence. Here, Appellant does not allege prejudicial evidence against him was *improperly* admitted, thus giving rise to the need for a curative instruction. Appellant does, however, indicate the State's evidence of his "extraneous conduct," including his "physically abusive relationship" with Estela, supported the need for an anti-sympathy/bias instruction.[8] While such an instruction may have been helpful, the trial court did provide instructions sufficient to ensure the jury did not improperly consider the evidence to establish Appellant's guilt of the charged offense. First, the trial court instructed the jury it could not consider evidence of any extraneous offenses committed by Appellant to establish his guilt of the charged offense, and it could only consider such evidence to establish "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistakes, or lack of accident of the defendant in connection with the offense alleged against him." *See* TEX. R. EVID. 404(b)(1)(2). In addition, the trial court properly instructed the jury it could only consider evidence of the circumstances surrounding the killing and the "previous relationship existing between the defendant and . . . the deceased . . . to show the condition of the mind of the defendant at the time

---

[8] We note the evidence was admitted without Appellant's objection.

17

of the offense." *See* TEX. CODE CRIM. PROC. ANN. art. 38.36(a).

Accordingly, we find no merit to Appellant's argument that the trial court erred by failing to give an anti-sympathy/bias instruction at his trial.

### C. No egregious error

And finally, even if we were to conclude the trial court was required to give such an instruction, failure to do so would not have constituted egregious harm. "Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *See Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007). In examining the record to determine whether jury charge error is egregiously harmful, we consider the entirety of the jury charge itself, the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole. *Id.* We have already considered Appellant's first argument and determined the jury charge was not erroneous in failing to include an instruction on the lesser-included offense of manslaughter. And we also reject Appellant's second argument that the contested issues and weight of the probative evidence supports a finding of egregious harm. Overwhelming evidence supported a finding that Appellant acted intentionally at the time of the shooting, and there is nothing in the record to suggest the jury reached its verdict by considering improper factors. Moreover, the jurors were cautioned multiple times about the need to act in a fair and impartial manner.[9]

---

[9] During voir dire, the State asked the jury panel whether they could be "fair and impartial," and defense counsel emphasized the need for jurors to remain "fair and impartial" during the trial. Prior to the trial, the court cautioned the jurors of the importance of assembling twelve "fair [and] impartial [jurors] without any sort of prior history that's going to get in the way of being fair in this case," the need to only consider the evidence presented to them in open court and not be influenced by outside information, and the need to avoid taking any action that could "compromise

Accordingly, we find that even if the trial court had erred by failing to provide the jury an anti-sympathy/bias instruction, any resulting harm would not have been egregious.

We overrule Appellant's second issue.

## CONCLUSION

The trial court's judgment is affirmed.

We note that while the trial court certified Appellant's right to appeal, the certification does not bear Appellant's signature indicating he was informed of his rights to appeal and to file a pro se petition for discretionary review with the Texas Court of Criminal Appeals. *See* TEX. R. APP. P. 25.2(d). The certification is thus defective and has not been corrected by Appellant's attorney or the trial court. To remedy this defect, this Court ORDERS Appellant's attorney, pursuant to Texas Rule of Appellate Procedure 48.4, to send Appellant a copy of this opinion and this Court's judgment, to notify Appellant of his right to file a pro se petition for discretionary review, and to inform Appellant of the applicable deadlines. *See* TEX. R. APP. P. 48.4, 68. Appellant's attorney is further ORDERED to comply with all of the requirements of TEX. R. APP. P. 48.4.


LISA J. SOTO, Justice

August 15, 2023

Before Rodriguez, C.J., Palafox, Soto, JJ.

---

the fairness to all parties in the case." And during the final charge to the jury, the trial court admonished it to arrive at its verdict only after "careful and impartial consideration of all the evidence in this case."

19